**KINGWOOD OIL CO. v. BELL et al.**

No. 10693.

United States Court of Appeals
Seventh Circuit.

April 17, 1953.

Rehearing Denied May 29, 1953.

Wirt L. Harris, Oklahoma City, Okl., Harold G. Baker and Leigh M. Kagy, East St. Louis, Ill., Clovis A. McKenzie, Oklahoma City, Okl., Baker, Kagy & Wagner, East St. Louis, Ill., of counsel, for plaintiff-appellant Kingwood Oil Co.

Philip R. Wimbish, Tulsa, Okl., John C. Roberts, East St. Louis, Ill., Charles M.

Spence, Joseph P. Logan, St. Louis, Mo., Richard H. Eagleton, Robinson, Ill., Thompson, Mitchell, Thompson & Douglas, St. Louis, Mo., for appellees.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff-appellant (hereinafter called Kingwood) brought this action against certain defendants who are legatees, grantees, and assignees of William Bell, deceased. These defendants joined in a motion to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted. The Texas Company was also named as a defendant, but did not join in the motion to dismiss, and filed an answer. The original complaint was dismissed and thereafter plaintiff filed its amended complaint, naming the same said defendants and seeking a declaratory judgment under 28 U.S.C.A. §§ 2201 and 2202. All of the defendants except the Texas Company again moved to dismiss. The Texas Company answered the amended complaint. The motion to dismiss the amended complaint was granted, and this appeal followed.

It is alleged in the amended complaint that William Bell, prior to his death on February 9, 1948, was the owner of oil and gas leases on real estate in Marion County, Illinois. Two of these leases are hereinafter referred to as the "Dodson" and "Shanafelt A" leases, and were dated July 9, 1936, and July 13, 1936, respectively. Each lease was for the term of ten years "and as long thereafter as oil or gas, or either of them, is produced from said land by lessee." Each lessor was to receive ⅛ of the oil produced and saved from the leased premises.

On September 7, 1938, William Bell entered into a written agreement with Kingwood for the drilling and development of the property under the Dodson and Shanafelt A leases. On October 28, 1938, he entered into another and similar agreement with Kingwood for the drilling and development of three small tracts in Section 16, hereinafter referred to as "Shanafelt C." In the unit operating agreement herein-after described, the three leases are referred to as "Tract No. 234—W. G. Dodson," "Tract No. 17—J. O. Shanafelt A," and "Tract No. 6—J. O. Shanafelt C."

In said agreements Bell assigned to Kingwood an undivided one-half interest in the working interest in each oil and gas lease. In the September 7 agreement Kingwood agreed to commence drilling on or before September 30, 1938; in the October 28 agreement, the drilling was to be commenced on or before November 20, 1938. The first agreement provided that Kingwood "shall continuously carry on said drilling of said well with due diligence to completion and if oil or gas sufficient for commercial production shall not be found in an upper formation said well shall be drilled to and into the McClosky producing formation, and if oil or gas shall be found in said well in paying quantities Kingwood shall drill additional wells on said Tract as fast as good business judgment shall dictate until said Tract shall be fully developed and said Kingwood shall drill all off-set wells that may be necessary to protect said Tract from drainage by other wells * * *." The second agreement provided that Kingwood "shall continuously carry on said drilling of said well with due diligence to the McClosky producing formation. If said well is a failure in the McClosky formation, but cores taken indicate commercial production in the upper formations, then the said well shall be plugged in the McClosky and made into a producing well in the upper formations, but if said well is a commercial well in the McClosky it shall be completed as a producing well in that formation, and another well drilled on said seven acre tract to the upper formations, if cores taken indicate commercial production in those formations." A similar provision applied to an eighteen acre tract covered also by the second agreement, and it was provided that the wells be drilled "as fast as good business judgment shall dictate, and Kingwood shall drill all off-set wells that may be necessary to protect said tracts from drainage by other wells * * *." Kingwood agreed to pay all costs and expenses of such development and operation, and of abandoning

and plugging wells which did not produce in paying quantities and those which became exhausted, and also agreed to protect William Bell from all liability for costs or damages incurred in connection with the development and operation of said wells, and to divide equally with William Bell all of the oil and gas saved from the 7/8 working interest under the leases. The provisions of Paragraphs 4, 5, and 6 of each agreement are set out in Footnote 1.

Kingwood proceeded with the development of the tracts hereinbefore described by drilling, equipping, and putting a number of oil wells into operation and production. The amended complaint alleges that Kingwood has complied with and carried out all of the terms and conditions of the two 1938 agreements by it to be performed. On November 1, 1940, Kingwood and Bell entered into a written agreement with the trustee of the Missouri-Illinois Rail-

road Company with respect to the railroad's right-of-way where it crossed the Shanafelt A tract. Under this agreement certain claims asserted by Kingwood and Bell against the trustee were settled by the payment of $50,000 to each (Kingwood and Bell) and in addition the trustee gave to Kingwood and Bell an oil and gas lease covering the 60 foot right-of-way upon which four wells had previously been drilled, and which were producing oil. The trustee also sold to Kingwood and Bell certain personal property used in connection with the four wells located on said right-of-way. There was no written agreement between Kingwood and Bell as to the operation of this property.

Prior to June 30, 1939, Kingwood and Bell, pursuant to an oral agreement between them, purchased two 80,000 barrel storage tanks which were installed on the Shanafelt A tract. The purchase price and in-

1. "4. Said Kingwood shall pay all costs, expenses and charges that shall be incurred by it in and about the performance of its duties hereunder and all damages that may be incurred by it in and about the performance of said duties and shall pay all rentals and other charges accruing under each of said leases after the date hereof, and shall properly equip each well on each of said leasehold estates which shall produce oil and gas or either of them in paying quantities, for the production, saving and marketing of the product or products thereof, and shall thereafter properly operate said leasehold for the production of said product or products, and shall pay all costs and expenses of abandoning and plugging each well which shall produce neither of said products in paying quantities and all wells which shall become exhausted, and Kingwood shall pay all costs and expenses of drilling, equipping, maintenance and operating said leasehold, and said Bell shall not be liable to Kingwood for any of said costs, expenses, damages or charges.

"5. Said Kingwood shall protect Bell and each of said leasehold estates from all liability for costs, expenses or damages that may be incurred by it—Kingwood —in and about the performance of the terms and conditions hereof required to be done or performed by it, and Kingwood shall carry proper insurance coverage to protect Bell and said leasehold estates from any and all such liabilities

and in order to protect himself and said leasehold estates from such liabilities upon default by Kingwood in making any one or more payments hereunder at maturity Bell may take such action as he deems proper against Kingwood to compel such performance and the conditions hereof shall be continuing and actions for any number of such defaults may be prosecuted and any number of such demands may be joined in the same action.

"6. Upon the completion of the first well on each of said tracts above described said Bank shall deliver the assignment of the interest in said Tract so executed by Bell to Kingwood and upon the delivery of each assignment to the said Kingwood all oil and gas produced and thereafter to be produced from the seven-eighths (7/8ths) working interest under the lease on the lands therein described shall be equally divided between the said Bell and Kingwood and said Kingwood shall deliver the one-half of all oil and the one-half of all gas produced and saved from the seven-eighths (7/8ths) working interest under the lease on the lands therein described to the pipeline or purchaser for Bell, free of all expenses and charges of every kind and description against Bell or his interest in said oil and gas, and all proper and necessary pipe line, division or other orders shall be executed and delivered by the parties hereto to effect such division."

cidental costs were shared equally between them. On February 15, 1941, the tanks were leased to Sohio Petroleum Company and the rentals amounting to $14,600 were divided equally between Kingwood and Bell. On July 31, 1942, these tanks were sold for $40,000 and Kingwood and Bell each received one-half of the sale price.

In 1942, in the vicinity of the Shanafelt A tract, oil was discovered in the Trenton lime, a deeper geological formation than the McClosky formation to and into which producing wells had been drilled in the Lake Centralia-Salem Oil Field. On September 4, 1942, Kingwood and Bell entered into a written agreement by the terms of which Bell agreed to pay one-half of the costs of deepening Well No. 19 on the Shanafelt A tract to the Trenton lime formation. The well was deepened and Bell paid one-half of the costs. This agreement provided in part: "3. Upon completion as a producing well, Kingwood shall carry on the production and operations of this well at its sole cost and expense precisely as in the case of all other wells on this property and this special agreement entered into because of the unusual costs and risks involved is not intended to change, nor shall it have the effect of modifying any part of the existing agreement for the development and operation of this property hitherto entered into except and only with respect to the costs of deepening Well No. 19 to the pay zone of the Trenton Limestone."

Well deepening operations were subsequently undertaken by Kingwood and Bell with respect to Wells Nos. 20, 21, 22, and 24 on the Shanafelt A tract. These operations were pursuant to oral agreements between Kingwood and Bell and the latter paid one-half of the costs of deepening these wells to the Trenton lime formation.

On July 11, 1941, Bell assigned to each of his sons, Kenneth C. Bell and J. M. Bell, an undivided ⅛ interest in said leaseholds. By reason of the subsequent death of J. M. Bell, his share is now owned by defendant Beatrice Mary Bell. The other defendants, except The Texas Company, received their interests in the leaseholds under the will of William Bell, deceased.

All the wells drilled on the leases hereinbefore described were drilled, completed and operated by the customary primary recovery method, which consisted of drilling wells to the oil producing formation, installing casing, pumping and storage equipment, and the pumping of the oil from the wells. About 5,000,000 barrels of oil were thus recovered.

By 1949 the production of oil in this field began to diminish and it was then apparent that commercial production would end within a reasonably short period unless some different method of production were utilized. A majority of the operators requested the owners and operators of all the oil wells in the field to join in a secondary recovery plan, which provided for the unitization and pooling of all the leases in the field. The plan called for the injection of water into certain input wells throughout the field, whereby the oil, being of a lighter specific gravity, would be driven to and recovered from wells in the higher parts of the geological formation. By this method a large amount of oil would be recovered which would otherwise have remained in the ground under the primary recovery method.

A unitization agreement and a unit operating agreement were prepared and were executed by a sufficient number of owners and operators to cause the secondary recovery plan to be put into operation effective September 1, 1950, under the control and supervision of The Texas Company as the unit operator.

The unitization agreement is between the "operators" and the "royalty owners" and covers a large area including the lands described in the Dodson, Shanafelt A, Shanafelt C, and the Missouri-Illinois Railway right-of-way leases. It provides that after its effective date the entire area is to be unitized, its production pooled and operated as one unit; that those entitled to payments are to be paid a percentage of all oil, gas and petroleum produced from the entire area rather than from the land which was covered by the leases in which they were interested.

The unit operating agreement is between the various operators (oil and gas leases)

who are authorized to prospect for and to produce oil and gas in the unitized area. It defines the area and horizons and adopts definitions contained in the unitization agreement. It pools the rights in oil and gas of all operators who become parties thereto, and provides for the unit operation of all oil and gas leases in the field, and for the payment for oil and gas produced on the basis of percentages in accordance with formulae contained therein.

By the provisions of the unitization agreement and of the unit operating agreement, Kingwood and the defendants will receive from the pooled oil produced in the Lake Centralia-Salem Field, percentages determined in accordance with Paragraph A, Article IV, of the unitization agreement for the first 33,360,784 barrels produced. This is the estimated amount that could have been produced from the field by primary recovery methods, and Kingwood does not dispute that it is liable for the production cost thereof, based on the percentage allocated to the leases here in question. However, after such quantity of oil has been recovered Kingwood and the defendants will receive different and lower percentages of all oil produced in the field. It is the additional costs of this production which Kingwood claims to be unusual and extraordinary, and similar to the unusual costs of constructing the storage tanks and deepening of the wells to the Trenton formation, and which Kingwood claims should be shared equally by it and the moving defendants.

Kingwood and the defendants executed both the unitization agreement and the unit operating agreement, but the moving defendants inserted above their signatures in each instrument the following reservation (recording data omitted): "The undersigned, Kenneth C. Bell, executor to continue the business of William Bell, deceased; Beatrice Mary Bell, a widow; Kenneth C. Bell and Helen Wilson Bell, his wife; Louise Bell Good and Calvin Good, wife and husband, each in their own right and as spouse of the other, hereby execute this Unit Operating Agreement,[2] reserving all their rights under a certain agreement between William Bell and Kingwood Oil Company, dated September 7, 1938, * * * and under a certain agreement between William Bell and Kingwood Oil Company dated October 28, 1938 * *."

The amended complaint alleged, and the answer of The Texas Company admitted, that the production of oil under a secondary recovery plan requires additional investment of substantial sums of money, and that the costs of operation under such a plan are larger than the costs of conventional primary recovery methods.

Kingwood sought a declaratory judgment, decreeing, among other things, that the agreements dated September 7, 1938, and October 28, 1938, between Kingwood and William Bell were limited and restricted solely and only to the drilling, completing, equipping and operating of oil wells and production of oil by the usual and customary primary recovery methods employed on such dates by prudent operators in the Lake Centralia-Salem Oil Field; that Kingwood and Bell did not intend that the 1938 agreements cover any other type of operation than primary recovery operations down to the McClosky formation; and that said agreements did not cover the operation of the leases and the production of oil by the secondary recovery plan which was made effective by the unitization agreement and the unit operating agreement.

Plaintiff insists that it is entitled to a declaration that Kingwood and Bell, by their acts and conduct after the execution of the 1938 agreements, showed that Kingwood was only obligated to pay the costs of drilling, equipping and operating the wells to the McClosky formation by the primary recovery method, and that any expense of the development and operation other than by the primary recovery method should be borne equally by Kingwood and Bell.

 This cause was decided on defendant's motion to dismiss the amended complaint. On such a motion all facts well pleaded in the complaint are deemed admitted. The amended complaint herein

2. In the unitization agreement that term was used in lieu of Unit Operating Agreement.

should not have been dismissed unless it appeared to a certainty that plaintiff would not be entitled to any relief under any state of facts which could be proved in support of its claims. No matter how likely it may seem that a plaintiff may be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to prove it. Peterson Steels, Inc., v. Seidmon, 7 Cir., 188 F.2d 193, 195; Kirke v. Texas Co., 7 Cir., 186 F.2d 643, 647; Chicago & N. W. R. Co. v. Chicago Packaged Fuel Co., 7 Cir., 183 F.2d 630; Carroll v. Morrison Hotel Corp., 7 Cir., 149 F.2d 404, 406. In Publicity Building Realty Corp. v. Hannegan, 8 Cir., 139 F.2d 583, the court said at pages 586–587: "The Federal Rules of Civil Procedure [28 U.S.C.A.] do not sanction the disposition of doubtful issues of fact or law upon motions to dismiss for insufficiency of pleadings." Allegations of the amended complaint have been hereinbefore set forth in considerable detail to demonstrate why we have concluded that the issues raised should not have been resolved on a motion to dismiss for insufficiency. Cf: Burley v. Elgin, J. & E. Ry. Co., 7 Cir., 140 F.2d 488, 490. We think that the plaintiff has made a sufficient showing to withstand a motion to dismiss upon the ground that the amended complaint failed to state a claim upon which relief can be granted.

In making its decision the trial court was apparently influenced by the clause which the moving defendants inserted above their names when they signed the unitization agreement and the unit operating agreement, " * * * reserving all their rights under a certain agreement between William Bell and Kingwood Oil Company dated September 7, 1938, * * * and under a certain agreement * * * dated October 28, 1938." Although at one point in the trial court's opinion it is stated that the result would have been the same if the owners of the Bell interests had not attached any reservation to their signatures, the court also stated, "The reservations do serve effectively, however, to rebut any inference or presumption that plaintiff might have urged that it was the purpose of defendants, by signing the agreements to release plaintiff from any obligation it might lease plaintiff from any obligation it might

have to 'carry' their interests as part of the promised consideration for its interest in the leases."

We think the reservation clause is ambiguous. Certainly the defendants did not and could not reserve "all" their rights which they had under the original agreements with Kingwood, because in many instances the provisions of the unitization agreement and the unit operating agreement are contrary to the provisions of the agreements made in 1938 with Kingwood. Thus, no longer could the defendants require Kingwood to shoot or acidize the wells, to drill offset wells, to deliver ½ of ⅞ of all oil or gas produced from wells described in said agreements, or to furnish full information concerning the drilling, equipping, tests and cores in connection with the development of the leases.

The decision of complicated issues, such as presented in the case at bar, can rarely be satisfactorily determined by striking a pleading. "Motions to dismiss pleadings * * * are to be granted sparingly and with caution." Cyclopedia of Federal Procedure, 3d Ed., Sec. 15.204.

We do not intend to indicate at this time how we think the issues will ultimately be determined. It might well be that after the issues have been fully litigated, the judgment will again favor the defendants. But the plaintiff is entitled to its day in court. We think Kingwood is entitled to introduce any material and competent evidence that it may have to support its claim that the original agreements executed in 1938 were in fact thereafter modified or amended, as shown by the acts of the parties. Further, with reference to the reservation clause, we think the district court should give consideration to the fact that such reservation clause did not purport in any manner to cover the wells or the oil produced therefrom on the railroad right-of-way lease.

We think justice will best be served by remanding the case so that the issues may be determined after a trial upon the merits. Therefore, the judgment dismissing the complaint is reversed, and the cause remanded to the district court for further proceedings not inconsistent with this opinion.