**KINGWOOD OIL COMPANY, a corporation, Plaintiff,**

v.

**Kenneth C. BELL, individually and as Executor to continue the business of William Bell, Deceased, Beatrice Mary Bell, Helen Wilson Bell, Louise Bell Good, Calvin Good and The Texas Company, a corporation, Defendants.**

Civ. A. 2173.

United States District Court
E. D. Illinois.

Sept. 8, 1955.

Wirt L. Harris, Clovis A. McKenzie, Oklahoma City, Okl., Harold G. Baker, Leigh M. Kagy, of Baker, Kagy & Wagner, East St. Louis, Ill., for plaintiff.

Richard H. Eagleton, Robinson, Ill., Joseph P. Logan, Charles M. Spence, of Thompson, Mitchell, Thompson & Douglas, St. Louis, Mo., Ray M. Foreman, of Foreman, Meachum & Clapper, Danville, Ill., for defendant.

PLATT, District Judge.

Plaintiff, Kingwood Oil Company, herein referred to as Kingwood, has brought this suit for a declaratory judgment[1] against Kenneth C. Bell and Louise Bell Good, devisees of William Bell, deceased, Beatrice Bell widow and sole devisee of J. M. Bell, and the Texas Company. The amended complaint is set out in Kingwood Oil Co. v. Bell, 7 Cir., 204 F.2d 8. This cause was dismissed on motion in the district court. The court of appeals reversed and remanded. The defendants other than the Texas

1. Title 28, U.S.C., §§ 2201– 2202.

Company have filed an answer and counterclaim. The Texas Company has filed an answer taking a neutral position on the result of the lawsuit, except claiming that it should be paid its costs of producing oil under the unitization agreements. Plaintiff has filed an answer to the counterclaim.

A controversy exists between King-wood and the Bells over the construction of assignments and agreements pertaining to a ½ interest in a ⅞ interest in oil and gas leases obtained by William Bell, and the effect of the Texas Company agreements thereon. The facts as shown by the evidence are largely undisputed.

The oil and gas leases were in the Lake Centralia-Salem Pool. In 1939 when production was at its height this was the second largest producing area in the United States. The pool was developed by the Magnolia, Shell, and Ohio Oil Companies, and several independents. The field was developed in a rapid manner when there were no limitations by the statutes of the State of Illinois on the spacing or production of wells.

William Bell was an experienced and shrewd operator who succeeded in obtaining oil and gas leases in this area. On July 9, 1936 he obtained an oil and gas lease on 80 acres from William G. Dodson and Daisy H. Dodson, his wife. He also obtained an oil and gas lease on July 13, 1936 from James O. Shanafelt and Nettie R. Shanafelt on 80 acres, known as "Shanafelt A", and other tracts of about 25 acres known as ";Shanafelt C".

Kingwood had leased 70 acres in the pool but had disposed of it and was anxious to operate again in the area. During the summer of 1938 and prior to September 7, Joseph King, president of Kingwood, now deceased, started negotiations with William Bell to acquire an interest in his oil and gas leases. Mr. Ben Taylor,[2] who was in charge of the land department of Kingwood, testified that he was present at one of these meetings between Kingwood and Bell at Bell's office in Robinson, Illinois. He stated that Kingwood wanted to test for oil on the leased area and Kingwood would drill, equip, produce, and deliver to Bell ½ of the oil from the ⅞ working interest free of all expenses so long as oil could be produced profitably. Bell wanted the wells drilled to the McClosky lime regardless of what was encountered at a lesser depth. King said he could not maintain a free ride for the life of the property and the leases would have to be amended when production of oil became unprofitable. Bell refused to enter into such an agreement at the time, but stated when production became unprofitable to Kingwood then the parties would discuss the situation and make amendments to the agreement.

As a result of the discussions on September 7, 1938 Bell executed an agreement [3] with Kingwood on each 80 acres

---

2. Taylor was a competent witness since he had no immediate or direct interest in the outcome of the suit. Brownlie v. Brownlie, 351 Ill. 72, 76, 183 N.E. 613; Britt v. Darnell, 315 Ill. 385, 392, 146 N.E. 510.

3. The agreement recited that:
 "*Whereas*, Bell is desirous of disposing of an interest in said above described Oil and Gas Leases, and of having wells drilled thereon, and
 "*Whereas*, Kingwood is desirous of acquiring an interest in said above described Oil and Gas Leases and of drilling said wells, and
 \* \* \* \* \*

"(1) Said Kingwood shall commence drilling a well upon said tract described as follows: (followed by a legal description of the Dodson Tract) on or before September 30, 1938, and shall continuously carry on said drilling of said well with due diligence to completion and if oil and gas sufficient for commercial production shall not be found in an upper formation said well shall be drilled to and into the McClosky producing formation, and if oil or gas shall be found in said well in paying quantities Kingwood shall drill additional wells on said Tract as fast as good business judgment shall dictate until said Tract shall be fully developed and said Kingwood shall drill all

and therewith on September 12, 1938 Bell signed two assignments to Kingwood for a ½ interest in his "Dodson" and "Shanafelt A" leases. The consideration recited in the assignments was $1 and other valuable consideration. The assignments were delivered to a bank in escrow. When the first well on each tract was drilled the assignments were to be delivered. Kingwood complied with the requirements of the escrow agreement and the assignments were delivered, and recorded. The agreement provided that Kingwood would drill to the McClosky producing formation and if oil was found in paying quantities in the McClosky or before, Kingwood would drill additional wells as fast as good business judgment would dictate until the tract would be fully developed. It was provided in the agreement that Kingwood was to bear all costs, expenses and charges, including any damages occurring in the production of oil. Kingwood was to carry insurance to hold Bell and the leasehold estate harmless. Bell was to receive ½ of the oil free of all expenses, and the parties were to execute pipeline, division, or other orders that might be required. The agreement further provided for wells every 10 acres in sand area, and twin wells, if production justified. In lime areas, one well to each 20 acres was specified. Bell, or his representatives, were entitled to be present during drilling, equipping and operating. Kingwood was to furnish Bell with information concerning all operations. The agreement was to be binding on heirs, successors, and assigns of the parties.

In October, 1938 another assignment and agreement was entered into between Kingwood and Bell on the 25 acres known as "Shanafelt C" on essentially the same terms as the prior agreement. Kingwood again complied with the agreement and the assignment was delivered.

Across the southeast portion of 80 acres of "Shanafelt A" was the right-of-way of the Missouri-Illinois Railroad Company. Four wells were drilled by the railroad company on this right-of-way, and about $360,000 worth of oil was produced prior to November 1, 1940. Guy A. Thompson, trustee of the rail-

---

off-set wells that may be necessary to protect said Tract from drainage by other wells now existing or hereafter to be drilled on lands in said territory and each off-set well shall be drilled by said Kingwood with due diligence

&ast; &ast; &ast; &ast; &ast;

"(4) Said Kingwood shall pay all costs, expenses and charges that shall be incurred by it in and about the performance of its duties hereunder and all damages that may be incurred by it in and about the performance of said duties and shall pay all rentals and other charges accruing under each of said leases after the date hereof, and shall properly equip each well on each of said leasehold estates which shall produce oil and gas or either of them in paying quantities, for the production, saving and marketing of the product or products thereof, and shall thereafter properly operate said leasehold for the production of said product or products, and shall pay all costs and expenses of abandoning and plugging each well which shall become exhausted, and Kingwood shall pay all costs and expenses of drilling, equipping, maintenance and operating said leasehold, and said Bell shall not be liable to Kingwood for any of said costs, expenses, damages or charges.

&ast; &ast; &ast; &ast; &ast;

"(6) Upon the completion of the first well on each of said tracts above described said Bank shall deliver the assignment of the interest in said Tract so executed by Bell to Kingwood and upon the delivery of each assignment to the said Kingwood all oil and gas produced and thereafter to be produced from the seven-eighths (7/8ths) working interest under the lease on the lands therein described shall be equally divided between the said Bell and Kingwood and said Kingwood shall deliver the one-half of all oil and the one-half of all gas produced and saved from the seven-eighths (7/8ths) working interest under the lease on the lands therein described to the pipe line or purchaser for Bell, free of all expenses and charges of every kind and description against Bell or his interest in said oil and gas and all proper and necessary pipe line, division or other orders shall be executed and delivered by the parties hereto to effect such division."

road company was in litigation with Magnolia Petroleum Company.[4] After this decision in the United States Supreme Court, Bell and Kingwood entered into negotiations with Thompson, as trustee, for the settlement of their rights in the oil. Thompson, the trustee, settled with Bell and Kingwood on November 1, 1940 and each received $50,000 and a bill of sale for the equipment. An oil and gas lease covering the right-of-way was also executed by Thompson, trustee, to Kingwood and Bell. Bell's interest in the equipment was conveyed to Kingwood for the sum of $7500.00. These wells produced until September, 1950 when the unitization agreements went into effect. The oil produced on the right-of-way was delivered to Bell without expense.

 Kingwood produced oil in large quantities. Twin wells were drilled in sand formations above the McClosky formation. Kingwood drilled wells through the McClosky formation (2000 to 2075 feet below surface) to the St. Louis (about 2200 feet below surface, and the Devonian strata (3300 to 3400 feet below surface). No dispute arose between Bell and Kingwood or between Kingwood and Bell's assignees over any oil produced despite the fact that Kingwood's agreement to give a 50% override[5] to Bell was unique in the field.

Problems arose due to inadequate facilities to get the large production of oil out of the field. Pipeline facilities were insufficient. Kingwood contacted Bell and they agreed to purchase two 80,000 barrel tanks to store oil. Each paid half for the purchase and construction of these tanks. The pipeline facilities increased and the tanks were rented to Sohio for $800 per month. Later the tanks were sold to Sohio for $40,000. The rental and sale price were divided equally between Kingwood and Bell.

Another episode occurred whereby a well was deepened to the Trenton limestone (4500 to 4600 feet below surface). It didn't look profitable, but the royalty owner was pushing for such a well. Asa Lee, representing Kingwood, talked this over with William Bell. An agreement was entered into between them. Bell was to pay one-half of the costs of drilling but after oil was produced the same provision was to be effective—delivery of one-half of the oil to Bell without expense. This letter-contract provided in part:

"This special agreement entered into because of the unusual costs and risks involved is not intended to change, nor shall it have the effect of modifying any part of the existing agreement for the development and operation of this property hitherto entered into except and only with respect to the costs of deepening Well No. 19 to the pay zone of the Trenton Limestone."

This well was successful and other wells were deepened under similar arrangements. Each contained a statement:

"It is our understanding that the expenses of this joint venture are being handled in the same manner and proportion as the deepening job on the Shanafelt A–19." (The first well deepened.)

Bell paid his expenses on these wells promptly.

One well was deepened to the St. Peter sandstone formation at a depth of 5,266 feet. Bell paid his share of the costs of drilling to make this test. It proved to be dry.

William Bell died on February 9, 1948. On July 11, 1941, he conveyed a 1/8 of the 7/8 interest under the "Shanafelt A" and "C" leases, and the "Dodson" lease to his son Kenneth C. Bell. On the same

---

4. Thompson v. Magnolia Petroleum Company, 309 U.S. 478, 60 S.Ct. 628, 84 L. Ed. 876.

5. An "override" is "an interest carved out of the lessees' share of the oil as distinguished from the owners' share." Keegan v. Humble Oil & Refining Co., 5 Cir., 155 F.2d 971, 973.

date he assigned an undivided ⅛ of the ⅞ interest in these leases to his brother J. M. Bell. The interest of J. M. Bell was devised upon his death under his last will to the defendant Beatrice Mary Bell, his widow. William Bell by his last will devised his remaining ¼ interest in the ⅞ interest in these leases in equal shares to Kenneth C. Bell, and his sister Louise Bell Good, who are also defendants.

Kenneth Bell acted as executor under the last will of William Bell until January, 1952. He employed Mr. L. A. Mylius, a petroleum engineer, as appraiser in the Illinois inheritance tax proceedings. His report stated that about the end of 1957 "the William Bell interest might have to contribute toward the expense to keep the lease operating." The Attorney General refused to accept the Mylius report on values and employed Mr. Leo B. Horton, a geologist of Mt. Vernon, Illinois, as an appraiser for the State of Illinois. Mr. Horton reported in part:

> "It will, therefore, be necessary for Bell Brothers, which will include the Estate of William Bell, to make some adjustment of the overriding royalty * * *"

The Bell interests in the leases were reported as working interests rather than overriding royalties.

After the death of William Bell, Kenneth Bell became a director of Kingwood and served for several years in that capacity. Asa Lee, who was president of Kingwood from August, 1940 to March, 1950 testified that in 1949 a discussion occurred between Kenneth Bell and himself in Bell's office in Robinson, Illinois. Lee claimed that Bell admitted that the secondary recovery program was not contemplated in the original agreements, but he would see what could be done about devising a new formula and getting all these interests to go along. Kenneth Bell denied this conversation at Robinson, but he did admit that he had a conversation about secondary recovery with Lee in Oklahoma City. He stated that during this conversation he said that if the operation ever proved to be no longer economically feasible for Kingwood he and his associates would be willing to discuss the matter. At a stockholders meeting of the Kingwood Oil Company on March 2, 1950 the problem of secondary recovery [6] was again discussed with Kenneth Bell.

On March 13, 1950 Kenneth Bell wrote to Kingwood acknowledging a phone conversation of March 3, 1950 with James F. Breuil, president of Kingwood, concerning a proposed supplemental agreement to relieve Kingwood from the agreements. In the letter Kenneth Bell stated they would not enter into any such agreement but when it becomes uneconomic for Kingwood to continue operating the leases under the present agreements the Bells would be happy to consider the matter. On March 17, 1950, Mr. Breuil replied that Kingwood would "block the flood" by not signing the Texas Agreements unless some relief was given to it. No agreement was reached.

All of the Kingwood-Bell leases were fully developed and produced a large quantity of oil. The production, however, reached its peak in 1940. About 1947 or 1948 general discussions began in the field concerning the use of artificial secondary recovery to get the remaining oil. About that time Judge Lindley decided Ramsey v. Carter Oil Company, D.C., 74 F.Supp. 481, affirmed 7 Cir., 172 F.2d 622, holding that the royalty owner there could not be compelled by the operator to join in the unitization agreement. After this decision there was consideration of the plan of drilling periphery wells on every lease, but this was found to be too costly a system.

The Texas Company took the lead in the negotiations to accomplish the

6. Secondary recovery is defined in Kingwood Oil Co. v. Bell, 7 Cir., 204 F.2d 8, 11.

production of oil induced by water flooding the pool. Two agreements [7] designated as the unit operating and the unitization agreement were prepared to be effective September 1, 1950 if signed by a sufficient number of operators and royalty owners. The defendants signed these contracts on June 2, 1950 inserting above their names the following clause:

"Reserving all their rights under a certain agreement between William Bell and Kingwood Oil Company, dated September 7, 1938, * * * and under a certain agreement * * * dated October 28, 1938."

Kingwood signed the agreements on June 29, 1950 and on the same day made an agreement with the Texas Company and the Magnolia Petroleum Company whereby Texas and Magnolia upon notice and payment by Kingwood of $30,000 would accept assignment from Kingwood of the one-half interest in the Bell leases and assume the obligations of the assignments and agreements. This option to Kingwood to relieve itself of its obligation to the defendants expires September 1, 1956.

Kingwood, during its operations prior to unitization, received a profit of $1,440,823.09; Bells for their interest received $2,577,313.99. The difference was due to the costs expended by Kingwood in the production of oil. Kingwood served notice on the Bell defendants to pay one-half of the costs under the unitization agreements but they refused. This lawsuit resulted.

Under the provisions of the unitization agreement and the unit operating agreement, both Kingwood and the Bells are to receive percentages of the oil produced as determined by a formula fixed by the unitization agreement. This percentage is higher for the first 33,360,784 barrels produced, the estimated amount that could have been recovered from the field by primary recovery methods. Kingwood does not dispute that it is liable for the costs of unitization attributable to the first 33,360,784 barrels produced. It claims that after such quantity of oil is recovered, the defendants should pay one-half of the cost of production of the oil which they receive.

The plaintiff maintains:

1. That the agreements between Kingwood and William Bell were never intended to cover secondary recovery as provided by the unitization agreements for the reasons:

(a) That secondary recovery was not contemplated by these agreements.

(b) That the parties by their acts and conduct construed the agreements to apply only to the primary recovery of oil.

2. That the unitization and unit operating agreements executed by Kingwood and the defendants dealt with new matters not covered by the 1938 agreements and thereby abrogated the prior agreements.

3. That the reservation written into the unitization agreements by the Bells was null and void.

Therefore, plaintiff concludes the defendants are liable to the Texas Company in certain proportions for their share of the cost of producing oil under the secondary recovery plan attributable to their interests.

The defendants, by their counterclaim, contend:

1. The consideration for the assignments was the delivery of the oil to them without costs of production, and that if the 1938 agreements are held void and ineffective the assignments should be set aside and the defendants should receive all the oil recovered by the Texas Company.

2. That if the 1938 agreements apply only to the oil in or above the McClosky formation, then the defendants are entitled to an accounting for all the oil produced from below the McClosky for-

---

**7.** The pertinent parts of these agreements will be set out later in this opinion.

mation less the cost of operation by Kingwood.

■ The first question presented is whether the 1938 agreements when executed were intended to deliver the oil to Bell free of the cost of production regardless of the method used to recover the oil. The agreements between Bell and Kingwood do not specify any method for the production of oil. The plaintiff maintains that is ambiguity. The defendants view the agreements as complete unambiguous documents. These agreements, like oil and gas leases, are subject to the same rules of construction as any other contracts. Kirke v. Texas Co., 7 Cir., 186 F.2d 643, 648. It was not necessary for the agreements "to state specifically all details in regard to the matter concerning which the parties are contracting." Welsh v. Jakstas, 401 Ill. 288, 294, 82 N.E.2d 53, 57. For example there is an implied covenant in an oil lease on the part of the lessee "to use reasonable diligence to develop the demised premises so long as the enterprise can be carried on at reasonable profit." Ramsey v. Carter Oil Co., D.C., 74 F.Supp. 481, affirmed, 7 Cir., 172 F.2d 622. This was a suit by a lessor to enjoin the lessee from using repressuring to recover oil on the leased land. The court held that the owner of the oil, the royalty owner, could not be forced, under the facts, to accept a production of oil which caused the oil under his land to migrate therefrom. The court clearly recognized the right of the lessee in an oil lease to obtain the oil by secondary recovery, when it stated in 74 F.Supp. at page 482:

> "Reasoning from analogy, it would seem that a reasonably prudent operator bound to produce oil by approved methods has the right implied in an oil lease to adopt proper gas repressuring systems for secondary recovery of oil. Indeed,

it would seem that he is under the same duty to do so as he is to drill. offset wells. In other words, defendant, as a prudent operator, has a right to adopt any approved method of repressure for secondary recovery * * *."

Thus, in the instant case the secondary recovery of oil would be implied as the privilege of Kingwood as in an oil lease. In a later case, Carter Oil Company v. Dees, 340 Ill.App. 449, 92 N.E.2d 519,[8] the Illinois Appellate Court for the Fourth District implied secondary methods in an oil lease. The lessee under an oil and gas lease brought an action for a declaratory judgment against its lessor seeking a construction of the lease to permit its use of secondary recovery on the defendants' property. It was stipulated in this case that oil migrating under the lessor's property would be substantially equal to that which was displaced and that the secondary recovery would assure the defendants a net cash gain over and above any gain that could be obtained by the continuation of primary methods. The appellate court in a two to one decision entered a declaratory judgment as prayed by the lessee. In its opinion the court said in 340 Ill.App. at page 456, 92 N.E.2d at page 522:

> "The mere fact that this method of production is modern is no reason to prevent its use by a rule of law. It is true the contract of the parties does not specifically provide for this process, but neither does it specify any other process. The contract being silent as to methods of production, it must be presumed to permit any method reasonably designed to accomplish the purpose of the lease; the recovery of the oil and the payment of the royalty. The court would violate fundamental principles of construction to in-

8. In a diversity case this court is bound by the decisions of state intermediate appellate courts, unless there is persuasive evidence that the higher court would rule

otherwise. Stoner v. New York Life Ins. Co., 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284; Preston v. Aetna Life Ins. Co., 7 Cir., 174 F.2d 10, 12.

sert by implication a provision that lessee is limited to production of such oil as can be obtained by old fashioned means, or by so called 'primary operations'."

In construing the instant agreements there is neither the problem of whether the lessors' oil would migrate from their property without their consent, nor whether secondary recovery is a reasonably prudent operation, nor whether there will be a loss to any of the parties. All the interested parties have signed the unitization agreements and have thereby consented to secondary recovery. Since the purpose of the 1938 agreements was to fully develop the demised premises and no specific method of production of oil was provided "it must be presumed to permit any method reasonably designed to accomplish the purpose of the lease;" the recovery of the oil according to the terms of the agreements. Carter Oil Co. v. Dees, supra. No language was used to contradict such a presumption. Therefore, there is an implied provision that Kingwood could produce oil by primary or secondary methods, and this is the implied intention [9] of the parties. In view of such a construction these agreements are not ambiguous in failing to specify the method for recovery of oil. Where there is no ambiguity the court is required to determine the intention of the parties, where the contract appears to be a complete expression of the parties, from the contract itself. Decatur Lumber & Mfg. Co. v. Crail, 350 Ill. 319, 183 N.E. 228; J. R. Watkins Co. v. Salyers, 384 Ill. 369, 51 N.E.2d 574; Ambarann Corp. v. Old Ben Coal Corp., 395 Ill. 154, 69 N.E.2d 835. No other conclusion can be reached than the parties intended Kingwood to pay all of the costs of production of the $\frac{7}{8}$ interest in the leases regardless of the method used under the situation here presented.

Assuming as plaintiff maintains that the agreements are ambiguous then the court should look to the surrounding circumstances when the instruments were made to determine the intention of the parties.[10]

"[P]ractical construction which the parties to a contract have given it by . . . subsequent acts or conduct will be followed by the court where there is doubt as to the meaning of the terms of the contract." Illinois Law and Practice—Contracts—Section 232, page 405.

The surrounding circumstances and acts of the parties which the plaintiff considers significant are:

1. The negotiations between Bell and Kingwood to obtain the assignments and agreements, when oil production was anxiously anticipated;

2. The sharing of the expenses and the cost of the additional storage tanks purchased and constructed by the parties;

3. The deepening of the wells to the Trenton Lime and the St. Peter formations which were done under a special agreement to share costs;

4. The fact that Kenneth Bell while acting as executor of the estate of William Bell represented the Bell interest as a working interest rather than as an override;

5. The settlement with Guy Thompson, trustee of the Missouri-Illinois Railroad Company.

When the agreements were obtained by Kingwood, Bell was undoubtedly in the driver's seat. He was the owner of the oil leases and Kingwood was anxious to share in the production of oil. Both Kingwood and Bell were experienced oil men. The evidence disclosed that Bell

9. "An implied intention is one necessarily arising from language used or a situation created by such language." Domeyer v. O'Connell, 364 Ill. 467, 470, 4 N.E.2d 830, 832, 108 A.L.R. 476.

10. "[T]he court will put itself in the 'shoes' of the contracting parties." Illinois Law and Practice—Contracts—Section 231, page 404.

had knowledge of secondary recovery.[11] Both parties knew that the tracts would be developed in the manner required of a prudent operator. Bell refused to provide for the termination of the "free ride" should conditions become unprofitable to Kingwood, and said he would discuss that situation at a later date. The negotiations did not limit the period of override, nor was a protection clause provided by the agreements. Kingwood was so desirous to have the half interest in the Bell leases that it accepted the agreements.

The sharing of the expenses and costs of additional storage tanks does not give meaning to the agreements. There was no provision that Kingwood should store oil for Bell. It was required only to deliver free of costs to Bell at the pipeline. When there was not sufficient pipeline facilities the logical thing for the parties to do was to buy additional storage tanks and each pay one-half of the cost.

When the deepening of the wells to the Trenton and St. Peter formations became the subject of discussion between Bell and Kingwood, Bell did pay one-half of the cost of drilling the wells deeper, but here again in his letter or offer which was accepted by Kingwood he stated:

"[T]his agreement is not intended to be, nor shall it have the effect of modifying the existing agreements."

The oil produced from the Trenton Lime was delivered to Bell without further cost indicating that the 1938 agreements were still effective.

Kenneth Bell, after the death of William Bell, became the executor of the estate of William Bell. In the inheritance tax proceedings in the State of Illinois he reported the Bell interest as a working interest. No doubt this was done to minimize the value of the leases at the time of the death of William Bell.[12] However, the terming of it as a working interest would not destroy the true meaning of the assignments and agreements.

This court finds nothing in the settlement with Guy A. Thompson, trustee of the Missouri-Illinois Railroad Company which relieved Kingwood. Guy A. Thompson has been producing oil from four wells on the M-I right-of-way. There was still some doubt as to the right to this oil although both Bell and Kingwood claimed the right to the oil.[13] Both Bell and Kingwood received $50,000, the equipment and an oil lease taken in both of their names from the trustee. The equipment was immediately sold to Kingwood who was the operator under the agreements. The lease was obtained from the trustee as further protection for Bell and Kingwood. Kingwood delivered the oil later produced from the right-of-way to Bell without costs of production. Again we find that the parties were carrying out the agreements for Bell to have an override.

In addition to the foregoing circumstances and acts of the parties Kingwood

---

11. The Illinois Statutes recognized secondary recovery. S.H.A. ch. 104, §§ 67, 84a, 84b; Ch. 93.05, Sec. 5, Jones Illinois Statutes Annotated, approved June 8, 1933.

12. The designation of the Bell interest as an overriding interest could be competent evidence against Kenneth Bell but not as against the other defendants. See Joyal v. Pilotte, 293 Ill. 377, 381, 127 N.E. 741; Monroe v. Becker, 283 Ill. 42, 49, 118 N.E. 1025; First Nat. Bank of Chicago v. McCarthy, 334 Ill.App. 480, 79 N.E. 2d 868.

13. Excerpt from contract of settlement agreement between Guy Thompson, trustee, and Kingwood and Bell.

"First Parties represent that they are now the owners of a certain oil and gas lease executed on the 13th day of July, 1936, by James O. Shanafelt and Nettie R. Shanafelt, his wife, as Lessor, and William Bell, as Lessee, * * * and that pursuant to said oil and gas lease they hold a seven-eighths (⅞) interest in all oil underlying a strip of land sixty feet wide, thirty feet on each side of the center line of main track of Missouri-Illinois Railroad * * *."

itself recognized that it was bound by the 1938 agreements. As soon as unitization of the area was proposed it started contacting Kenneth C. Bell to obtain a supplemental agreement to protect it on the payment of all of the costs under the agreements. By this conduct Kingwood removed any doubt as to the meaning of the terms of these agreements.

From all the circumstances surrounding the transaction and the acts of the parties this court concludes that the parties abided by the agreements and they in their entirety remained in full force and effect until the effective date of the unitization agreements with Texas.

▓▓▓▓ The provisions of the Unitization and Unit Operating Agreements with Texas are contrary to some of the provisions of the agreements. As stated by the court of appeals in Kingwood Oil Co. v. Bell, 204 F.2d at page 13:

"Certainly the defendants did not and could not reserve 'all' their rights which they had under the original agreements with Kingwood, because in many instances the provisions of the unitization agreement and the unit operating agreement are contrary to the provisions of the agreements made in 1938 with Kingwood. Thus, no longer could the defendants require Kingwood to shoot or acidize the wells, to drill offset wells, to deliver ½ of ⅞ of all oil or gas produced from wells described in said agreements, or to furnish full information concerning the drilling, equipping, tests and cores in connection with the development of the leases."

This still leaves the vital question of whether the override was abrogated by the Texas Agreements.[14] The purpose of the Texas Agreement was:

"It is deemed proper to enter into this agreement in order to institute and carry out water flooding operations in said Field and in order to more efficiently develop, produce and operate the Lake Centralia-Salem Field for the purpose of preventing surface and underground waste, obtaining the greatest ultimate recovery and conservation of the unitized substances, and insuring to each of the parties to this agreement his fair and equitable share thereof." (Section 102 of the Unitization Agreement and Section 103 of the Unit Operating Agreement.)

Further provisions of the Texas Agreements provide:

"The portions of unitized substances allocated to the separately owned tracts in the manner set forth herein, shall be treated in the same manner, and with the same force and effect as though such allocated production had been produced from, and was the full production of the separately owned tracts respectively." (Section 402 of the Unitization Agreement.)

"It is understood and agreed that this agreement shall never be construed as imposing upon any royalty owner any obligation to pay for any development and operating expenses unless such royalty owner is obligated to pay for same by the terms of agreements existing before the execution of this contract." (Section 801 of the Unitization Agreement and substantially Section 1401 of the Unit Operating Agreement.)

" 'Royalty Owner' is defined as one, who, subject to an operator's right to search for and produce oil, * * * owns land, * * * overriding royalties, oil payments, * * * or other rights in any oil, * * * that may be produced from the participating area, and who has signed the royalty owner's unitization agreement unitizing the participating area." (Section 206 of the Unit Operating Agreement

14. See Midstates Oil Corp. v. Waller, 5 Cir., 207 F.2d 127, wherein the unitization agreements are read together with oil and gas leases to determine the rights of the parties.

**240**

and substantially Section 206 of the Unitization Agreement.)

"The part of the unitized substances due each operator under the applicable allocation, shall be delivered to him in kind and each operator shall be separately liable for and shall pay out of said allocation to tracts of land all royalty or other payments which he may be obligated to pay on account thereof, and in accordance with the terms of the respective leases or other contracts covering or affecting such respective tracts." (Section 401 of the Unit Operating Agreement.)

From the foregoing provisions it is plain that the Texas Agreements were drawn specifically to permit the existing agreement between the operator and the overriding royalty owner as to the costs of production of oil to remain in effect. All types of rights to the oil were kept intact. The defendants come within the definition of a "Royalty Owner" and are entitled to their oil without cost of production, and Kingwood was still required to pay all the costs.

The defendants signed the agreements on June 2, 1950 and placed the reservation clause above their names. Kingwood signed the Texas Agreements June 29 knowing of these provisions, and in spite of their clear admonition. Kingwood had made efforts to obtain a modification of the 1938 agreement with the defendant, even to the extent of threatening to block the flooding operation, but to no avail. The reservation clause was not only ambiguous as declared by the court of appeals but standing alone with the agreement was a nullity. It nevertheless served notice on Kingwood that the defendants were still claiming that the 1938 agreements, although amended, were in effect.

The plaintiff also contends that because the Texas Agreements are not limited to the development of any forma-

tion they revoke the 1938 agreements under which Kingwood was not obligated to drill below the McClosky formation.

▆▆ The agreements on "Dodson", "Shanafelt A", and "Shanafelt C" recite:

"Whereas, Bell is desirous of disposing of an interest in said above described Oil and Gas Lease, and of having wells drilled thereon, and

"Whereas, Kingwood is desirous of acquiring an interest in said above described Oil and Gas Lease and of drilling said Wells, * * *" [15]

This recital would lead to the conclusion that Kingwood was to drill wells irrespective of the depth. An examination of the body of the contracts strengthens this conclusion. In the first instance the well was to be drilled to McClosky in order for Kingwood to receive the assignments and "if oil or gas shall be found in said well in paying quantities Kingwood shall drill additional wells on said tract as fast as good judgment shall dictate until said tract shall be fully developed." Paragraph 4 of the contract provides for the payment of costs incurred by Kingwood in the production of oil, and again refers to "all wells which shall become exhausted, and Kingwood shall pay all costs and expenses of drilling, equipping, maintenance and operating said leasehold * * *." Paragraph 6 of these agreements clinches this construction. It refers to the completion of the first well and "upon the delivery of each assignment to the said Kingwood all oil and gas produced and thereafter to be produced from the seven-eighths (⅞ths) working interest under the lease on the lands * * * shall be equally divided * * * and said Kingwood shall deliver the one-half of all oil * * * produced and saved from the seven-eighths (⅞ths) working interest * * * to the pipe line or purchaser for Bell. * * *" If the agreements

---

15. Resort will be had to the recitals of the contract if necessary to determine the intention of the parties and operating provisions thereof. Guhl v. Guhl, 376 Ill. 100, 110, 33 N.E.2d 185.

are considered ambiguous in the development of the lease without regard to horizon, the acts of the parties conclusively refute plaintiff's contention. Kingwood did drill deeper than McClosky to the St. Louis and Devonian formations, and oil recovered from the Devonian was delivered to Bell as an override.

 This brings the solution of this case to the point made by the court of appeals where it stated in 204 F.2d at page 13:

"Further, with reference to the reservation clause, we think the district court should give consideration to the fact that such reservation clause did not purport in any manner to cover the wells or the oil produced therefrom on the railroad right-of-way lease."

The court of appeals referred to the reservation clause, not the assignments and agreements. The lease to Bell, and the assignment and agreement on "Shanafelt A", across which was the M-I strip, did not except the right-of-way from the description of the tract.[16] In Illinois "the granting of a right-of-way to a railroad does not convey a fee in the land but conveys an easement only"; and therefore the right-of-way owner has no interest in the oil. Tallman v. Eastern Illinois & Peoria R. R. Co., 379 Ill. 441, 41 N.E.2d 537. It was the manifest intention of the parties as expressed in the instruments that the oil under the right-of-way was included. If the instruments are considered uncertain in this regard, the parties by their acts construed the assignment and agreement to include this oil. Bell and Kingwood were shrewd and experienced oil men. It is a reasonable inference that they knew of the dispute between the right-of-way owner and the owners of the land, and they did not except the right-of-way strip in their instruments in order to protect and include their interest to the oil. After Kingwood took possession of the oil wells on the right-of-way the oil was delivered to Bell without expense and in accordance with the agreement. Plaintiff has argued that the unitization agreements in scheduling the various tracts specifically separated the M-I strip, but this is of no weight. In scheduling the various tracts the unitization agreements specifically state:

"Note: The names following the Tract Numbers in this Schedule are for aid in identification only, and shall not be accorded any significance with respect to title or ownership. The description of each tract is for purposes of allocation only, and shall not be considered determinative of title or ownership of such tract or any interest therein."

This court, therefore, concludes that the plaintiff is not entitled to a declaratory judgment as prayed, and it is obligated to pay all the costs on the oil produced by unitization.

Findings of fact, conclusions of law, and order in accordance herewith may be submitted.

---

16. Plaintiff in his complaint by an oversight states that there was an exception.