**KINGWOOD OIL COMPANY, Plaintiff-Appellant,**

v.

**Kenneth C. BELL, Beatrice Mary Bell, Helen Wilson Bell, Louise Bell Good, Calvin Good, and The Texas Company, Defendants-Appellees.**

No. 11672.

United States Court of Appeals Seventh Circuit.

May 3, 1957.

Rehearing Denied June 5, 1957.

Leigh M. Kagy, John M. Ferguson, East St. Louis, Ill., Wirt L. Harris, Clovis A. McKenzie, Oklahoma City, Okl., for plaintiff-appellant. Baker, Kagy & Wagner, East St. Louis, Ill., of counsel.

Charles M. Spence, Joseph P. Logan, St. Louis, Mo., Ray M. Foreman, Danville, Ill., Enos L. Phillips, Urbana, Ill., Philip R. Wimbish, Tulsa, Okl., Richard H. Eagleton, Eagleton & Newlin, Robinson, Ill., for defendants-appellees other than Texas Co. Thompson, Mitchell, Thompson & Douglas, St. Louis, Mo., Foreman, Meachum & Clapper, Danville, Ill., of counsel.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

DUFFY, Chief Judge.

This case is here for the second time. Plaintiff seeks a declaratory judgment that it is obligated to pay only half the cost of secondary recovery methods of oil and gas allocated to the leases involved, and that the heirs and assignees of William Bell are obligated to pay the other half.

The District Court granted a motion to dismiss the amended complaint. This Court reversed, Kingwood Oil Co. v. Bell, 7 Cir., 204 F.2d 8, and remanded the case for a trial upon the merits. A trial was held before the Court without a jury. Findings of Fact and Conclusions of Law favorable to defendants were filed, and the amended complaint was again dismissed.

In our previous opinion we set forth the pertinent facts in considerable detail. We were enabled to do so before the trial because the determination of the issues herein depends in large measure upon the correct interpretation of written documents which were attached to the amended complaint as exhibits. We shall endeavor to set forth facts in this opinion only to the extent necessary to show the basis for our decision. However, some repetition is unavoidable.

In 1938, William Bell was the owner of three oil and gas leases in Marion County, Illinois. These were known as Shanafelt "A"; Shanafelt "C" and the Dodson leases. In June, 1938, the Lake Centralia-Salem oil field was opened up. Bell desired to have his leases tested for oil and gas, and made agreements with plaintiff to drill wells on each of the leases to the McClosky limestone formation, and upon completion of each well, to assign to plaintiff a one-half working interest in each of the leases. These agreements are hereinafter sometimes referred to as the 1938 agreements. The wells were completed and the assignments were made. Shanafelt "A" turned out to be one of the largest single producing leases in the field.

The first of these agreements dated September 7, 1938, provided that Kingwood should commence drilling a well upon the Dodson lease on or before September 30, 1938, and within 90 days should commence the drilling of a well on the Shanafelt "A" lease. Kingwood was required to drill additional wells " * * * until said Tract shall be fully developed and said Kingwood shall drill all off-set wells that may be necessary to protect said Tract from drainage by other wells

* * * ." The agreement then provided that Kingwood should, when necessary, shoot or acidize each well drilled by it and properly equip the same for the protection, saving and marketing of oil and gas.

In paragraph 4 it was provided that Kingwood " * * * shall pay all costs, expenses and charges that shall be incurred by it in and about the performance of its duties hereunder and * * * Kingwood shall pay all costs and expenses of drilling, equipping, maintenance and operating said leasehold, and said Bell shall not be liable to Kingwood for any of said costs, expenses, damages or charges."

The second agreement dated October 28, 1938, which covered other leases, is almost identical to the first agreement in the respects hereinbefore quoted. These provisions are the only ones which deal with the obligation of Kingwood to pay all the costs or expenses.

The 1938 agreements between William Bell and Kingwood contained no provision whatsoever with respect to costs and expenses of water-flooding operations or any other form of secondary recovery of oil and gas. In the negotiations no mention was made by either party of the prospect or possibility of secondary recovery. This is understandable in the setting in which the agreements were made. The first agreement was signed less than three months after the date of the bringing in of the discovery well. The field expanded at an extremely rapid pace, and within three months' time had reached the vicinity of the Shanafelt "A" lease. A well was then being drilled on the Young Schoolhouse lease, just across a 40-acre tract from the Shanafelt "A" property. Large portions of the entire field were being drilled in a mad, disorderly rush. Both William Bell and Kingwood were anxious to get into quick production before off-setting wells could drain the oil which underlay the Shanafelt "A" and their other leases. At that time in Illinois there was no proration and no limitation on the number of wells which could be drilled or how they should be spaced.

When the 1938 agreements were negotiated, the conferences were between Joe King, then President of Kingwood Oil Company, and William Bell. Both were experienced oil operators. King objected to what he termed a "free ride" for Bell, i. e., the delivery at the pipe line of one-half the oil produced, free of any cost of drilling, production and overhead. King maintained such a free ride would cause abandonment of the properties long before the end of the economic life of such properties was reached. King suggested that the free ride be changed when the production of the wells reached 40 or 50 barrels a day. Bell refused to agree but did suggest that when the time came he and King would sit down and discuss such amendments as might be necessary. King then said the deal was agreeable to him.

Kingwood contends the 1938 agreements are extremely limited in scope and were intended to apply only to usual and customary operations, and not to cover unusual costs and risks. Kingwood claims this is shown by the interpretation given to the contract by Joe King and William Bell and in support thereof, cites the following incidents:

A. The production from Shanafelt "A" and other leases was so great that pipe line facilities were soon entirely inadequate. Kingwood and Bell agreed to and did purchase two 80,000-barrel tanks for storage of oil which were installed on the Shanafelt "A" Tract. The purchase and incidental costs were shared equally between them. Later, they leased the tanks and shared the rental income equally. Finally, in 1942, they sold the tanks and each received one-half of the sale price.

B. In 1942, oil was discovered in the Trenton Lime, a deeper geological formation than the McClosky. On September 4, 1942 King and Bell entered into a written agreement by the terms of which Bell agreed to pay half of the costs of deepening Well No. 19 on the Shanafelt "A" Tract to the Trenton Lime formation. The well was deepened, oil was found, and Bell paid one-half of the costs.

However, this agreement provided in part: "3. Upon completion as a producing well, Kingwood shall carry on the production and operations of this well at its sole cost and expense precisely as in the case of all other wells on this property and this special agreement entered into because of the unusual costs and risks involved is not intended to change, nor shall it have the effect of modifying any part of the existing agreement for the development and operation of this property hitherto entered into except and only with respect to the costs of deepening Well No. 19 to the pay zone of the Trenton Limestone."

C. By an exchange of letters dated February 18, 1943 and February 19, 1943, respectively, pertaining to Well No. 20, King and Bell agreed the expense of the joint venture would be handled in the same manner and proportion as the deepening job on Well No. 19. Supplemental oral agreements were made covering Wells 21, 22, and 24 which were likewise deepened, and William Bell paid his share of the costs thereof.

D. King and Bell, as well as other oil operators, had considered the possibilities that the St. Peter formation which was found in the Salem Field at a depth exceeding 5,000 feet, might be productive. Kingwood and Bell orally agreed to test the St. Peter sandstone formation. It turned out to be a dry hole. William Bell paid his share of the costs.

Peak production in the Lake Centralia-Salem field was reached early in 1940. By 1947–1948 there were many discussions by operators in this field as to the advisability of producing oil and gas by a secondary recovery system. By 1949 the production of oil had diminished to the extent that plans were undertaken to have the owners and operators of all the oil wells in the field join in a secondary recovery plan known as a waterflood system, which provided for the unitization and pooling of all leases in the field. A Unitization Agreement and a Unit Operating Agreement were prepared and were executed by a sufficient

number of operators and owners to cause the secondary recovery plan to be put into operation effective September 1, 1950 under the control and supervision of The Texas Company as the unit operator.

Oil and natural gas occur in the interstices of porous rocks, commonly termed "sands" which have been laid down in a structure serving as a trap in which the oil and gas are confined. Before the reservoir is penetrated, these substances remain under pressure. When a well is drilled into the reservoir, the pressure often is strong enough to force the oil out to the surface of the well. The principal force which results in this flow is the gas, which, in forcing the oil upward, comes to the surface with it. When the pressure subsides, auxiliary means, such as pumping, or airlifts, aid in bringing oil to the surface. However, at all times gas pressure is an essential factor in moving the oil through the formation to the bottom of the well where lifting devices can be applied. It is to the process of securing oil through the flow under natural pressure, alone or aided by lifting or pumping devices, that the term "primary recovery" is applied.

Modern experience has proved that much of the oil which would be left within a reservoir under the primary method of production may be recovered through procedures which included building up the pressure within the reservoir through the introduction of gas or air, under pressure, and by means of input wells located at strategic points. And also, as in the case of Lake Centralia-Salem field, the flooding of the formations with water to drive the oil ahead of it to outlet wells. These processes are designated as "secondary recovery."

Under the secondary recovery method, uses of wells are often different from the use made of such wells in primary recovery operations. Some wells are converted from producing wells to "input" wells. Water or other substance is introduced into the "input" well and

driven to the bottom of the well by pressure. It is then driven back into the formation from which it drives oil ahead of it to some output well from which it is brought to the surface.

William Bell died February 9, 1948. Kenneth C. Bell became a director of Kingwood and served in that capacity for several years. The matter of an agreement pertaining to sharing costs under a secondary recovery program was discussed by Asa Lee, President of Kingwood, with Kenneth Bell at a stockholders' meeting in 1949. Other discussions followed. Lee sought some formula by which the cost of the secondary recovery program could be shared between Kingwood and the Bell interests. Kenneth Bell testified no such agreement was reached but admitted that he had said if the operation proved to be no longer feasible for Kingwood, he and his associates would be willing to bring the matter up for further discussion. On March 13, 1950 Kenneth Bell wrote Kingwood that the Bells had "decided not to enter into any supplemental agreement at this time."

On March 17, 1950 Kingwood wrote to Kenneth C. Bell in an endeavor to have the Bells accept an assignment of Kingwood's interest when production of oil under the water-flood system fell to a point where Kingwood would have to pay out more than it would receive. Kingwood estimated such a loss would run from $15,000 to several hundred thousand dollars. The secondary recovery program could not go forward without Kingwood's signature. The letter stated: "We have reached the point where we must say that either some relief must be had before entering this agreement or we will block the flood." The Bell interests did not consent to the suggestion. Thereafter Kingwood entered into a contract with The Texas Company and Magnolia Petroleum Company whereby these two companies, for a consideration of $30,000.00, would assume all of Kingwood's obligations and receive the benefits of all of Kingwood's rights under the 1938 agreements at any

time they were requested to do so by Kingwood. Thereafter, Kingwood did sign the contracts and the water-flood recovery system came into operation.

The Unitization Agreement is between the "operators" and the "royalty owners" and covers a large area including the lands described in the Dodson, Shanafelt "A", Shanafelt "C" and the Missouri-Illinois Railway right-of-way leases. It provides that on its effective date, the entire area is to be unitized, its production pooled and operated as one unit; that those entitled to payments are to be paid a percentage of all oil, gas and petroleum produced from the entire area rather than from the land which was covered by the leases in which they were interested.

The Unit Operating Agreement is between the various operators (oil and gas leases) who are authorized to prospect for and to produce oil and gas in the unitized area. It defines the area and horizons and adopts definitions contained in the Unitization Agreement. It pools the rights in oil and gas of all operators who become parties thereto, and provides for the unit operation of all oil and gas leases in the field and for the payment for oil and gas produced on the basis of percentages in accordance with the formulae contained therein.

When the persons representing the Bell interests signed the Unitization Agreement and the Unit Operating Agreement, they inserted above their signatures in each instrument the following reservation: "The undersigned, Kenneth C. Bell, Executor to continue the business of William Bell, deceased; Beatrice Mary Bell, a widow; Kenneth C. Bell and Helen Wilson Bell, his wife; Louise Bell Good and Calvin Good, wife and husband, each in their own right and as spouse of the other, hereby execute this Unit Operating Agreement,[1] reserving all of their rights under a certain agreement between William Bell and Kingwood Oil Company, dated September ber 7, 1938, * * * and under a certain agreement between William Bell and Kingwood Oil Company, dated October 28, 1938. * * *"

By the provisions of the Unitization Agreement and the Unit Operating Agreement, Kingwood and defendants will receive from the pooled oil produced in the Lake Centralia-Salem field, percentages determined for the first 33,360,784 barrels produced. This is the estimated amount that could have been recovered from the field by primary recovery methods, and Kingwood does not deny its liability for its proportionate cost in producing same. However, after such quantity has been recovered, Kingwood and defendants will receive different and lower percentages of all oil produced in the field. It is the additional costs of this production which Kingwood claims would be unusual and extraordinary, and which should be shared equally by Kingwood and the Bell interests.

The purpose of the 1938 agreements was to fully develop the property described in the leases. No particular method for recovery of oil was specified. Although secondary recovery methods undoubtedly were not uppermost in the minds of Joe King and William Bell at the time they signed the agreements, yet, secondary recovery methods were, at that time, well known in the industry. Kenneth C. Bell testified he knew of two companies conducting repressuring operations on their own properties before 1938. Another indication of the knowledge of the industry is shown in Utilities Production Corporation v. Carter Oil Co., 10 Cir., 72 F.2d 655, at page 659, where the court said: "The use of gas for repressuring was so widely known in the industry by 1917—two years before the Regulations were adopted—that the Interior Department had prepared and issued a bulletin of 120 pages on the general subject. Repressuring was in common use in the Appalachian fields in 1916. That there was no present need

---

I. In the Unitization Agreement, that term was used in lieu of Unit Operating Agreement.

for it in the Osage field in 1919 does not lead to the conclusion that * * * were in ignorance of practices common in the eastern oil fields and of bulletins put out by the Interior Department." We hold there is substantial evidence to support the findings of the District Court that William Bell and Joe King knew of secondary recovery methods at the time they signed the agreements in 1938.

At the dates of the execution of the Shanafelt and Dodson leases, and at the time the 1938 agreements were executed, there was nothing in Illinois law which prohibited secondary methods of recovery under those instruments. In fact, § 89 of Chap. 93, Smith-Hurd Stats.1935 and 1937 provided in part: " * * * except that the owner or operator of any such well shall be permitted to introduce air, gas, water or other liquid, under controlled pressure into said oil or gas-bearing rock for the purpose of recovering the oil or gas contained therein. * * * "

Kingwood's greatest reliance seems to be based on the argument that the contracting parties themselves placed a practical interpretation upon the 1938 agreements by sharing the costs and expenses whenever unusual or extraordinary conditions were encountered. Kingwood argues that the secondary recovery method by water-flood was an unusual and extraordinary condition, and that the Bell interests should share the costs and expenses involved after the recovery of 33,360,784 barrels.

The incident of the storage tanks is not significant. There was no provision in the contracts that Kingwood should store oil for Bell. It was required only to deliver oil free of cost at the pipe line. With the pipe lines choked with oil, it was mutually advantageous to Kingwood and Bell that large storage tanks be erected, and it was natural that they should share the costs involved in erecting same, and in the proceeds when sold.

Also, the deepening of the wells where Bell paid half the costs does not support Kingwood's contention. As to Well No. 19 it was specifically provided the agreement "is not intended to change, nor shall it have the effect of modifying any part of the existing agreement * * *." The exchange of letters as to Well No. 20, and the oral agreements as to Wells Nos. 21, 22 and 24, all incorporated the same agreement. Also, we cannot see any indication of an interpretation of the contracts as urged by Kingwood in the joint venture to drill the well to the St. Peter formation.

True it is that Kenneth Bell stated on several occasions that he and his associates would consider Kingwood's complaint about the Bells having a free ride, but the record clearly indicates that such time never arrived, and that the Bells continued to insist upon their rights under the original 1938 agreements.

When those representing the Bell interests signed the Unitization Agreement and the Unit Operating Agreement, they expressly stated they reserved all their rights under the 1938 agreements. Of course, they couldn't do that where the Unitization Agreement and the Unit Operating Agreement specifically changed certain conditions, but such reservations were, at least, notice to Kingwood that they had not altered or changed their previous stand of insisting that the oil produced must be at the expense and cost of Kingwood.

Kingwood urges that the Unitization Agreement and the Unit Operating Agreement supplant and take the place of the 1938 agreements, but Article IX of the Unitization Agreement provides: "As amended hereby, all oil and gas leases covering tracts of land within the participating area shall be and remain in full force and effect according to their terms."

Sub-article 401 of the Unit Operating Agreement states: "The part of the unitized substances due each operator under the applicable allocation, shall be delivered to him in kind and each operator shall be separately liable for and shall pay out of said allocation all royalty or other payments which he may be obligated to pay on account thereof, and

in accordance with the terms of the respective leases or other contracts covering or affecting such respective tracts."

The Findings of Fact are supported by the record and certainly are not clearly erroneous. We agree with the District Court that the plaintiff is not entitled to a declaratory judgment as prayed, and that it is obligated to pay all the costs on the oil produced by the unitization program.

Judgment affirmed.