HENRY G. MEIGS, INC., Plaintiff-Appellant,

v.

EMPIRE PETROLEUM COMPANY, Defendant-Appellee.

Nos. 12698, 12709.

United States Court of Appeals Seventh Circuit.

Jan. 11, 1960.

Ray T. McCann and Richard A. Mc-Dermott, Milwaukee, Wis., for appellant.

John S. Walter, Sheboygan, Wis., William R. Loeffler, Denver, Colo., for appellee.

Before HASTINGS, Chief Judge, KNOCH, Circuit Judge, and PLATT, District Judge.

PLATT, District Judge.

Henry G. Meigs, Inc., plaintiff-appellant (plaintiff), brought this action to recover damages for breach of contract of April 27, 1956, with Empire Petroleum Company, defendant-appellee (defendant). The contract provided in part that in the event the parties were unable to negotiate a new contract for 1957 plaintiff's claim for $39,098.05 would become due and payable, less any payment made by defendant. No contract was consummated for 1957 and plaintiff sued to recover $34,098.05, the net amount alleged to be due. After the trial to the court judgment was entered for the defendant. Plaintiff has filed this appeal.

Plaintiff was a broker located in Madison, Wisconsin, and sold paving asphalt cement used in the construction of county, state and federal highways. It sold approximately 60% of the paving asphalt used by the highway contractors in Wisconsin.

Plaintiff and Wisconsin Oil Refining Company entered into an agreement under date of February 17, 1955, whereby plaintiff was the sole distributor of all asphalt cement produced by Wisconsin, with the exception of purchases in ten listed counties. Wisconsin Oil Refining Company was merged with defendant in January, 1956 which resulted in defendant acquiring a substantial portion of the available market for asphalt cement in Wisconsin. Defendant also sold asphalt cement in Michigan. Following the merger defendant negotiated the contract with plaintiff dated April 27, 1956, upon which this suit is brought. During the negotiations plaintiff claimed that it has suffered damages in the sum of $39,098.-05 as a result of the breach of the 1955 contract betwen plaintiff and Wisconsin.

The 1956 contract between plaintiff and defendant read in part as follows:

"Whereas, second party [plaintiff] alleges the execution and existence of a contract between it and Wisconsin Oil Refining Company, Inc., dated February 17, 1955, appointing second party sole distributor of all asphalt cement produced by the said Wisconsin Oil Refining Company, Inc., and,

"Whereas, second party maintains that it has sustained damages in the amount of Thirty Nine Thousand Ninety Eight and 5/100 Dollars ($39,098.05) under the terms of the contract aforesaid during the year 1955 by reason of the failure of Wisconsin Oil Refining Company, Inc. to perform the terms of said contract; and,

\*    \*    \*    \*    \*    \*

"Whereas, the first party [defendant] maintains that the aforesaid contract was void from its inception as a contract against public policy, and that, if the contract was in full force and effect during 1955, the same ceased to have any existence after December 31, 1955, and,

"Whereas, first party maintains that any claim for damages made by second party should be offset by an accounting to first party by second party of all profits from the sale of asphalt under which said purported claim arises; and,

"Whereas, the parties are desirous of terminating and settling all differences whatsoever between them now existing or hereafter to arise, and are, further, desirous of doing business together to their mutual benefit."

Then followed the provision whereby plaintiff would have an exclusive territory within a 50 miles radius of the city of Sheboygan, to sell the asphalt cement manufactured by defendant during the paving season of 1956 at an agreed price. The paragraph upon which this controversy arises read:

"VI. First party agrees to pay second party the sum of Twenty-Five Thousand Dollars ($25,000.00) in full settlement of the claim of second party under the contract dated February 17, 1955, payable as follows: First party shall pay to the second party Fifty Cents ($.50) per ton for all paving asphalt delivered and sold by first party to second party such payments to be made on the last day of each month during the term of this contract. If the sum of such payments so made do not amount to Five Thousand Dollars ($5,000.00) during the term of this contract, then in that event first party will pay to second party enough money to make up the difference between Five Thousand Dollars ($5,000.00) and the total of the payments so made. When all of said payments shall equal the sum of Twenty-Five Thousand Dollars ($25,000.00) said obligation shall be fully paid and satisfied. In the event the parties hereto are unable to negotiate a new contract for the year 1957 and subsequent years and before said Twenty-Five Thousand Dollars ($25,000) shall be fully paid, then the full amount of its claim of Thirty-Nine Thousand Ninety Eight and 5/100 ($39,098.05) shall be due and payable to second party and the first party agrees to pay the second party immediately the sum of Thirty-Nine Thousand Ninety-Eight and 5/100 Dollars ($39,098.05) less any payment made to second party by reason of the payment provided by this paragraph. The parties further agree that in the event first party fails to carry out the terms of this contract, that the sum of Thirty-Nine Thousand Ninety-Eight and 5/100 Dollars ($39,098.05) less the amounts paid as provided by this paragraph shall become due and payable to second party, in addition to the damages, if any, sustained by the party of the second part by reason of the failure of the party of the

first part to carry out the terms of this contract."

The parties fulfilled the requirements of this contract and defendant paid plaintiff $5,000.00 from its purchases of asphalt cement.

Negotiations for a 1957 contract were initiated by plaintiff in August, 1956. Thereafter the parties corresponded and discussions were had during the week of January 7, 1957. After the negotiation conferences, the attorney for plaintiff reduced to writing what he believed to be the agreement. This proposed contract dated January 21, 1957 was sent to defendant on January 31, 1957. It contained the following paragraph:

"It is further agreed by and between the parties that the party of the first part shall not sell paving asphalt cement with the penetration ranges as herein specified to any broker or highway contractor or to any customer of the party of the first part directly or indirectly at prices less than herein stated and party of the first part agrees that its price to any broker or highway contractor or customer of the party of the first part shall be the prices herein stated plus the latest tariff established by the Schwerman Trucking Company."

After objections by defendant, changes were made by plaintiff to provide for the proper grade of asphalt. On February 26, 1957, defendant drafted its version of the contract with some further changes and presented it to the plaintiff. Defendant also sent a letter to Mr. Meigs, the President of the defendant, on February 26, 1957, which stated:

"[T]he price formula which sets forth that you will be entitled to the lowest price which we offer to any highway contractor or any person, firm or corporation re-selling our asphalt cement to any such highway contractor, and in addition, in case we should offer a lower delivered destination price to any highway contractor you would be offered the same price, and in such case you would still be entitled to your regular sales discount of $1.50 per ton. I believe this gives you ample protection in case competitive conditions force us to sell below the price formula as set forth. * * * We object to the paragraph proposed by you for the reason that it might be construed to be a price fixing agreement which might be illegal, and we therefore cannot enter into any such arrangement."

Plaintiff in its letter of March 14, 1957 objected to the provisions inserted by defendant for load indicators on the transport trucks, that defendant might sell to other contractors and to the word *reasonably* unable to negotiate a contract for 1957. The letter closed by stating:

"It is apparent from your re-draft that we cannot negotiate a new agreement and we, therefore, make this demand upon you, that you pay us the sum of $34,098.05, the balance due us on the indebtedness as set forth in Paragraph VI of our Agreement of April 27, 1956."

Defendant replied by letter of April 1, 1957.

"Your proposed contract, however, attempted to bind us so that we would maintain a price to all of our customers (not just highway contractors), and whereby we would be required to maintain this price irrespective of market conditions. We consider this attempt to be highly unreasonable and could not under any condition accept such. There are several reasons why this provision is not acceptable, and among these is the fact that it appears to be an attempt to fix prices, which might be in violation of the Robinson-Patman Act and, therefore, might be a violation of Federal laws and subject us to a possibility of treble damages. We cannot, under any condition, enter into any such price fixing arrangement.

*   *   *   *   *   *

"[W]e do not concede that a condition exists whereby we are unable to negotiate a new contract for the year of 1957 and subsequent years."

On April 10, 1957 plaintiff, by letter, objected to the provision that trucks be equipped with indicators and insisted upon the paragraph for a fixed price, claiming that it was not in violation of any law. Plaintiff demanded that its proposed contract be signed within five days or all negotiations would cease and again demanded the $34,098.05. Negotiations ended and plaintiff filed this suit on April 20, 1957.

Plaintiff first contends that the contract of April 27, 1956 did not require the parties to conclude a contract for 1957. This issue is not pertinent. The terms of the new contract were not set forth in the '56 contract and without laboring the point the parties were not bound by an agreement to enter into an agreement. See Machesky v. City of Milwaukee, 1934, 214 Wis. 411, 253 N.W. 169; Ratcliff v. Aspros, 1948, 254 Wis. 126, 35 N.W.2d 217.

Plaintiff next contends "[t]he plain meaning of the language used [in the '56 contract] is that if there was no contract negotiated for 1957, the stipulated sum became due and payable." As the basis for this contention plaintiff asserts that "[t]he 1956 contract contains no provision to the effect that the negotiations were to be had in good faith, or even that the parties were required to negotiate with respect to a contract of 1957." It is further argued that the $39.098.05 was a debt due plaintiff. In other words plaintiff maintains that it had the legal right, under the terms of the contract to refuse to negotiate for a '57 contract, and to force the defendant to pay this amount. Such a construction is unreasonable, illogical and unjust. It is a general rule that contracts must be construed by the court in accordance with the mutual intention of the parties as ascertained from the contract as a whole. The recital or whereas clause of a contract may be examined to determine the intention of the parties.

Kingwood Oil Co. v. Bell, D.C.E.D.Ill. 1955, 136 F.Supp. 229, affirmed 7 Cir., 244 F.2d 115. The recitals to the '56 contract stated that plaintiff "maintains * * * it has sustained damages * * * by reason of the failure of Wisconsin Oil Refining Company, Inc., to perform the terms of [the '55] contract." The recitals further stated that defendant denied the plaintiff's right to damages because the '55 contract was invalid and the damages would be offset if there were an accounting made of the profits by plaintiff. The recitals finally expressed the desire of the parties to settle differences and to establish a business relationship for their mutual benefit. Thus, the $39,098.05 was neither made certain as to damages sustained, nor acknowledged by the defendant as a debt. In paragraph VI the parties termed the $39.098.05 as "[plaintiff's] claim" but not as the defendant's debt. The claim was payable "in the event the parties * * * [were] unable to negotiate a new contract for year 1957 and subsequent years." To interpret the contract as plaintiff contends the contract should have stated that the defendant would pay plaintiff the $39,098.05, as damages incurred or as a debt, in the event plaintiff refused to enter into a new contract. Instead the contract was worded, that the claim was to be paid "in the event the parties * * * [were] unable to negotiate a new contract." Webster's New International Dictionary defines negotiate "to conduct communications or conferences as a basis of agreement." Plaintiff ignores the words "to negotiate." It is common sense that they intended to negotiate for a new contract for 1957 and subsequent years and obligated themselves to do so. The parties did negotiate and recognized the practical construction of the contract that they were obligated to negotiate.

"Under recognized rules of interpretation of contracts, when one construction would make a contract unusual and extraordinary while another equally consistent with the language used would make it reason-

able, just, and fair, the latter must prevail." Bank of Cashton v. La Crosse County S. T. Mut. Ins. Co., 1934, 216 Wis. 513, 257 N.W. 451, 452.

It would indeed be unusual and extraordinary when the contract is construed as a whole to interpret the contract so that plaintiff could force a forfeiture of the claim without negotiations. It was the mutual intention of the parties that they were obligated to negotiate for a '57 contract and this construction is reasonable, just and fair. The obligation to negotiate carries with it the duty of the parties to negotiate faithfully.

> "Contracts are usually entered into by businessmen with the purpose that they shall be performed, and there is an implied agreement that each party shall exercise good faith in trying to carry them out." Marrinan Medical Supply v. Ft. Dodge Serum Co., 8 Cir., 1931, 47 F.2d 458, 462.

The district court properly held that "the contract of April 27, 1956 demanded good faith negotiations by the parties."

Plaintiff further contends that it did negotiate in good faith for a 1957 contract. Plaintiff insisted that the paragraph in its proposed contract that defendant would not sell paving asphalt cement "to any broker or highway contractor * * * directly or indirectly at prices less than * * * stated" in the contract was not illegal. This paragraph violated the Wisconsin Statutes, 1955, § 133.01(1). Said section provided in part as follows:

> "Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal. Every combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition in the supply or price of any article or commodity in general use in this state, to be produced or sold therein or constituting a subject of trade or commerce therein, or which combi-nation, conspiracy, trust, pool, agreement or contract shall in any manner control the price of any such article or commodity, fix the price thereof, limit or fix the amount or quantity thereof to be manufactured, mined, produced or sold in this state, or fix any standard or figure in which its price to the public shall be in any manner controlled or established, is hereby declared an illegal restraint of trade."

The district court made the following findings which are substantially supported by the evidence:

> "9. The above quoted paragraph is intended to and would fix the price of all of Empire's sales of paving asphalt cement to all of Empire's customers in Wisconsin and vicinity.

> "10. Both Empire and Meigs sell the type of asphalt cement concerned to public authorities, Federal, State and local, both directly and indirectly for use in the construction and repair of Federal, State and local highway systems.

> "11. Both Empire and Meigs enjoy a substantial portion of the available market for asphalt cement in Wisconsin and Empire sells this product to customers in Michigan."

Based upon these facts the paragraph in question was a violation of the Wisconsin Statutes. In State v. Retail Gasoline Dealers Ass'n of Milwaukee, 256 Wis. 537, 41 N.W.2d 637, the court held that a combination to fix the retail price of gasoline in Milwaukee was a violation of Section 133.01. In this case the dealers in the Association did not enter into a contract to fix prices but the Association only circulated a bulletin urging the dealers to "sit tight" on present prices. In State v. Lewis & Leidersdorf Co., 1930, 201 Wis. 543, 230 N.W. 692. The court condemned as a violation of Section 133.01 of 1929, an agreement between a minority of the cigar dealers of Milwaukee and defendant wholesaler, whereby the dealers received a discount on the price of cigars by purchasing ex-

clusively from the wholesaler. These pronouncements of the Wisconsin court indicate that the paragraph in question here would be a more flagrant violation. Plaintiff relies upon Cottington v. Swan, 1906, 128 Wis. 321, 107 N.W. 336; Durbrow Commission Co. v. Donner, 1930, 201 Wis. 175, 229 N.W. 635; Singer Sewing Machine Co. v. Lang, 1925, 186 Wis. 530, 203 N.W. 399, and Johnson v. Shell Oil Co., 1957, 274 Wis. 375, 80 N.W.2d 426, to demonstrate that the Wisconsin Statute is not applicable. The Cottington and Durbrow cases involved a sale of a business and a restraint to compete. In Singer Sewing Machine Co. the plaintiff sold Singer Sewing Machines, a trade-marked article, at retail through its agents directly to the customers at a fixed price. The Johnson case involved a single lease on a gasoline filling station owned by Shell, which provided for the sale of "Shell" products at fixed prices, which affected only a minute portion of the market. None of these cases avoids the effect of the Wisconsin Statute on the instant case. In Kosuga v. Kelly, 7 Cir., 1958, 257 F.2d 48, affirmed 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475, rehearing denied 359 U.S. 962, 79 S.Ct. 796, 3 L.Ed.2d 769, Judge Major, speaking for this court, held that a similar Illinois Statute was not applicable to interstate commerce but only to intrastate commerce. The Wisconsin Supreme Court has held that the Wisconsin Statute should receive the same interpretation as is placed upon the Sherman Act, 15 U.S. C.A. §§ 1 and 2, by the Supreme Court of the United States. Pulp Wood Co. v. Green Bay P. & F. Co., 1914, 157 Wis. 604, 147 N.W. 1058. The paragraph in question was not limited to intrastate commerce but also applied to interstate commerce because Empire sold asphalt cement to users in Michigan. Price fix-

ing agreements also violate the Sherman Act. In United States v. McKesson & Robbins, 351 U.S. 305, 309, 76 S.Ct. 937, 940, 100 L.Ed. 1209, it was stated:

"It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices."

Plaintiff mistakenly cites Kelly v. Kosuga, supra (358 U.S. 516, 79 S.Ct. 429) as holding that a price-fixing agreement is not illegal under the Sherman Act. In this case the seller sought to recover from the buyer an unpaid balance due for onions sold and delivered. At page 520 of 358 U.S., at page 432 of 79 S.Ct., id., the court there said:

"Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'"

Plaintiff's argument that asphalt cement falls within the exception provided by Section 1, Title 15 U.S.C.A. (known as Miller-Tydings Act) and 133.25 [1] of the

---

1. Wisconsin Statute, 1955, § 133.25. "Certain contracts not in restraint of trade; exceptions

"(1) This section may be cited as the 'Fair Trade Act.'

"(2) As used in this section 'producer' means grower, baker, maker, manufac-

turer, and 'commodity' means any subject of commerce.

"(3) Except as provided in subsection (4) and (6), no contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand or name

1955 Wisconsin Statutes, the "Fair Trade Act" is equally fallacious. Asphalt cement could not possibly fall within the articles there exempted. The price-fixing paragraph violated both the Wisconsin and Federal Statutes. By plaintiff's insistence upon the inclusion of this paragraph in the proposed contract for '57, plaintiff did not faithfully negotiate for a new contract.

To permit the plaintiff to recover in this action would be unconscionable, unreasonable and unjust. Plaintiff did not negotiate in good faith as it was obligated to do. The defendant twice warned the plaintiff of the illegality of the plaintiff's proposed price-fixing paragraph. The defendant interposed no unreasonable demands upon plaintiff and was willing to continue the negotiations. It was plaintiff who ended the negotiations and demanded the $34,098.05.

 Finally plaintiff contends that it should "recover $20,000.00 in installments of $5,000.00 annually, which the defendant conceded was due plaintiff." Plaintiff offers nothing in its brief to support this contention. We have searched the record and do not find where defendant conceded the $20,000.00 was due plaintiff. During the negotiations the defendant in a letter offered to pay $5,000.00 each year until $25,000.00 was paid, to settle plaintiff's claim. Such a settlement was set forth in paragraph VI of the '56 contract and defendant did pay the first $5,000.00 in compliance therewith. The failure to conclude a new contract vitiated the compromise as we interpret the contract. Plaintiff refused defendant's offer to pay the balance of $20,000.00 and demanded "its claim." Moreover, plaintiff by refusing

to negotiate in good faith breached the contract and if there were an obligation for the defendant to carry out the terms of the compromise plaintiff's initial breach foreclosed its right to enforce the contract. In Kosuga v. Kelly, 7 Cir., 1958, 257 F.2d 48, 56, this court said:

"It is a well established principle that a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party."

Plaintiff is not entitled to recover the $20,000.00.

The judgment of the district court is Affirmed.

---

of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others, shall be deemed a contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce by reason of any of the following provisions contained in such contract:

"(a) That the buyer will not resell such commodity except at the price stipulated by the vendor.

"(b) That the vendee or producer shall require that any person to whom delivery of a commodity is made for the purpose of resale shall agree that the latter will not, in turn, resell except at the price stipulated by the vendor or vendee. * * *"