**Jack FROST, Appellant,**

v.

**Nathanael DAVIS et al., Appellees.**

**No. 21762.**

United States Court of Appeals
Fifth Circuit.

May 20, 1965.

James E. Tribble, Robert Asti, John Rodgers Camp, Jr., and Blackwell, Walker & Gray, Miami, Fla., for appellant.

W. O. Mehrtens, James E. Glass, Miami, Fla., Mershon, Sawyer, Johnston, Dunwody, Mehrtens & Cole, Miami, Fla., of counsel, for appellees.

Before TUTTLE, Chief Judge, and PHILLIPS * and WISDOM, Circuit Judges.

TUTTLE, Chief Judge:

This appeal requires that the Court construe a written contract between several parties who were associated in the exploration and development of petroleum properties in Cuba. While the trial court stated, in dismissing the complaint brought by appellant, that "the plaintiff has not proven either count of his complaint by a preponderance of the evidence," the case was submitted to the trial court on a stipulation, and involved simply and solely the construction of a written contract in the light of other written contracts embodied by reference. We, therefore, find no question of burden of proof or a requirement that the plaintiff carry his case by "a preponderance of the evidence." The resolution of the issue depends solely upon a legal determination made by the trial court as to the meaning of a written contract. The judgment thus made is subject to review by this Court in the same manner as if it were a pure question of law.

The contract that required interpretation in order to fix the obligations between the two parties to this litigation is spoken of throughout as the "final assignment." The relationships of the

* Senior Circuit Judge of the Tenth Circuit, sitting by designation.

parties prior to the execution of the final assignment may be succinctly stated:

The predecessor of Cuban Stanolind entered into a "Basic Agreement" with two Cuban organizations, and agreed to undertake certain exploratory and drilling operations in return for certain concession rights in Cuban oil property. Under the "Basic Agreement" Cuban Stanolind could terminate operations at the end of any year provided it paid a penalty of one million dollars for doing so. Cuban Stanolind later conveyed a ⅛ interest in the "Basic Agreement" to Frost, who, in turn, conveyed that interest to his corporation, Hidrocarburos. This ⅛ interest carried with it the benefits as well as the "duties, obligations and liabilities" of Cuban Stanolind under the "Basic Agreement." Frost then arranged with Davis, appellees' decedent, for the latter to have a ½ undivided interest in Frost's ⅛ interest in the "Basic Agreement." In obtaining this interest, Davis undertook all the "duties, obligations and liabilities" of Frost and Hidrocarburos up to a specified dollar limit.

Thus it is that just prior to the execution of the final assignment Cuban Stanolind had 87½% interest in the project, Hidrocarburos had 6.25% and Davis 6.-25% interest. As between Stanolind and Frost, Frost was obligated to reimburse Stanolind for the entire 12½% of the "duties, obligations and liabilities" of Cuban Stanolind up to a certain dollar amount each year (the dollar limitation is not relevant here), but as between Frost and Hidrocarburos, the latter assumed one-half of Frost's obligation and as between Frost and Hidrocarburos and Davis, Davis assumed the entire obligation for paying the obligations owed by the entire 12½% interest. At this point all parties agree that Davis' obligation included his liability to reimburse Stanolind for 12½% of the penalty or liquidated payment of $1,000,000.00 if Stanolind should decide to pay to terminate operations at the end of any year.

The question presented to the Court is whether the final assignment changed the relationship between Davis and Hidrocarburos or Frost so that when Cuban Stanolind did pay the million dollar penalty for cancelling the agreement, Davis remained liable only for his specific part of the penalty rather than remaining liable also for the part which represented the interest of Frost and Hidrocarburos.

Whatever else the final assignment accomplished, it is plain that at least one of the primary purposes was to readjust the interest of Stanolind on the one hand, and the Frost-Davis interest on the other. (Frost is used generically to include Hidrocarburos.) This is made plain by the only paragraph which seems to express the *purpose* for the agreement. It reads:

"Whereas, Hidrocarburos and Davis have requested Cuban Stanolind to adjust their privileges, rights, titles, interest, duties, liabilities and obligations under the basic agreement and the supplemental agreement in such manner that their monetary commitments under such two agreements shall not exceed the amounts contemplated by their participation in the basic agreement; and Cuban Stanolind has acceded to such request upon the terms and conditions hereinafter set out;

"Now, therefore, in consideration of the premises and of the mutual covenants of the parties hereto as hereinafter set out, it is agreed as follows:

"1. Hidrocarburos and Davis do hereby transfer, assign, set over and convey unto Cuban Stanolind, free and clear of any encumbrances by or in favor of Hidrocarburos, Davis or Frost, a 4.0254% undivided interest in and to all the privileges, right, title and interest originally acquired by Cuban Stanolind in and under the basic agreement, the letter agreement and the supplemental agreement, said 4.0254% undivided interest being a part of the 12.5% undivided interest which became vested in Hidrocarburos and Davis by virtue of the assignments hereinabove identified in subparagraphs E., F. and G. of the above recitals and by virtue of the waiver letter and ratifi-

cations identified in subparagraphs H., J. and K. of the above recitals of this instrument; it being understood that Cuban Stanolind hereby releases Hidrocarburos and Davis from the obligation and liability to reimburse Cuban Stanolind with respect to 4.0254% of Cuban Stanolind's costs, expenses and expenditures under the basic agreement and the supplemental agreement.

"2. All parties hereto recognize and agree that (exclusive of operating rights which are recognized to be solely in Cuban Stanolind under the operating agreement) from and after the execution and delivery of this instrument the ownership of the privileges, rights, titles and interests created by the basic agreement, the letter agreement and the supplemental agreement, as between the parties hereto, shall be in the following undivided proportions:

| | |
|---|---|
| Cuban Stanolind | 91.5254% |
| Hidrocarburos | 4.2373% |
| Davis | 4.2373% |

subject to the terms, covenants and conditions set out in the Frost assignment.

"3. All parties hereto further recognize and agree that (exclusive of operating duties which rest solely on Cuban Stanolind under the operating agreement) from and after the date hereof the duties, liabilities and obligations of the parties under the basic agreement, the letter agreement and the supplemental agreement shall be borne in the following proportions:

| | |
|---|---|
| Cuban Stanolind | 91.5254% |
| Hidrocarburos | 4.2373% |
| Davis | 4.2373% |

subject to the terms, covenants and conditions set out in the Frost assignment.

"4. As between Hidrocarburos and Davis, it is agreed that for and during the 7½ year period beginning January 1, 1956, the costs of the exploration and drilling program contemplated by the basic agreement and the supplemental agreement chargeable to the combined 8.4746% Hidrocarburos and Davis interest shall be paid by Davis to the extent of a total expenditure by Davis for such purpose during such period of $1,250,000.00. * * *

* * * * * *

"6. As between Frost and Davis, it is agreed that the undertakings made herein by Davis in favor of Hidrocarburos are made by Davis and accepted by Frost in lieu of the undertakings made by Davis in the Davis assignment identified in paragraph G. hereof and Frost hereby releases Davis of and from the performance of any and all duties, obligations and liabilities other than the duties, obligations and liabilities of Davis specified in this agreement.

"7. Nothing herein shall constitute a waiver of any of Cuban Stanolind's rights under the Frost assignment nor a release of Jack Frost from liability to Cuban Stanolind with respect to the proportionate part of its costs, expenses and expenditures in said exploration and drilling program chargeable to the combined Hidrocarburos-Davis interest.

Cuban Stanolind, with the concurrence of Hidrocarburos and Davis, decided to discontinue operations at the end of 1958. It so notified the lessor organizations and paid the one million dollar penalty as provided in the Basic Agreement. Cuban Stanolind then invoiced Hidrocarburos and Davis for $42,373.00 each representing the 4.2373% interest of each under the "Final Assignment." On all payments in connection with the exploring and drilling operations in 1956, 1957 and 1958, it was Cuban Stanolind's practice to invoice both Hidrocarburos and Davis according to their shares as set out in the "Final Assignment." It was then the practice for Hidrocarburos to send its invoice to Davis, which Davis would pay directly to Cuban Stanolind. When Hidrocarburos received this invoice cov-

ering the cessation penalty, it sent this invoice to Davis for payment. This time, Davis refused, claiming that he was not liable for this particular amount. The successor of Cuban Stanolind sued Frost and Hidrocarburos for the $42,373.00, as it was explicitly entitled to do under Paragraph 7 of the "Final Assignment," and it recovered that amount. This suit was brought by Frost to recoup the sums paid over to Cuban Stanolind's successor.

As we have stated, it is conceded that prior to the final agreement, Davis would have been obligated to pay Hidrocarburos' share of the termination penalty as well as his own, since under his original assignment he undertook to bear Hidrocarburos' "duties, liabilities and obligations." In the final agreement Davis agreed, by paragraph 4 quoted supra, as between Hidrocarburos and himself to pay "the costs of the exploration and drilling program contemplated by the basic agreement * * * chargeable to the combined 8.4746% * * *" still retained by Hidrocarburos and Davis. The question of the construction of the contract then is whether Davis' agreement to pay "the costs of the exploration and drilling program contemplated by the basic agreement" included the obligation to pay the same proportion of the million dollar termination payment as for the regularly billed drilling costs.

Since the final assignment provided that its provisions were accepted in lieu of the undertakings made by Davis in the Davis assignment, and since Frost agreed in the final agreement, quoted in paragraph 6 supra, to release "Davis of and from the performance of any and all duties, obligations and liabilities other than the duties, obligations, and liabilities of Davis specified in * * * [the final] agreement," Frost's recovery depends upon a construction of the final agreement to the effect that "the costs of the exploration and drilling program contemplated by the basic agreement," includes the cost of terminating the agreement.

The trial court held that the termination penalty was not such a cost as had been undertaken by Davis in his agreement to pay the share of Hidrocarburos. The court concluded that whereas Hidrocarburos and Davis both agreed with Stanolind to remain bound to discharge "duties, liabilities and obligations of the parties under the basic agreement," in his agreement with Frost and Hidrocarburos he agreed to something different, i. e., to pay Hidrocarburos' share of "the cost of the exploration and drilling program contemplated by the basic agreement."

As stated, the case was tried entirely on the written contract. There was no effort made to show what other duties, liabilities and obligations there were on the part of the percentage participants in the project other than the obligation to pay for the drilling costs and the share of the termination payment, if made. We, therefore, are required to look at the language of the contract, and, of course, in doing so we look at the entire contract with an effort to understand the true meaning of the parties.

Probably the most striking argument against the view adopted by the trial court is that nothing in the final agreement appears to contemplate any intention of changing the obligations of Frost and Hidrocarburos on the one hand, and Davis on the other inter sese. The "whereas" clause of the contract, which we have quoted, indicates that the purpose of the final agreement is, not to change the relationships between the fractional owners, but to change the relationship as between them as a group and Stanolind on the other side. The purpose was to relieve the Hidrocarburos-Frost-Davis group from part of the obligations they were under so long as they held a full 12½% interest. The operative terms of the contract accomplished this by Frost-Hidrocarburos-Davis surrendering one-third of their interest in the basic agreement. There is no explanatory language anywhere in the contract, other than the basic clauses which we have quoted above, from which it could be deduced that there was any purpose on the part of Frost and Hidro-

carburos to surrender any rights they had as against Davis so far as the latter's obligation to pay the entire bill for the entire outlay was concerned.

The next significant fact about the final agreement touching on the question in issue is that there appears to be no consideration flowing from Davis to Frost or Hidrocarburos in return for which it is claimed that the Frost-Hidrocarburos interest surrendered the right to have some $42,000 of terminal payments charged to them actually paid by Davis. We do not say that there is not sufficient consideration in the entire final agreement as between all of the parties, in light of the rearrangement of basic interests in the property to support whatever agreements the court finds were made. We do say, however, that it is quite relevant to our consideration of what the contract meant to note that Davis contends that in a contract, which did not indicate it as one of the purposes, and which provided no consideration for the concession, Davis achieved a substantial benefit from a co-participant.

Then, we come to the language itself. It is apparent that by making the payment of one million dollars, Stanolind profited to the extent that it was not required to continue for several additional years making very substantial outlays in continuing the drilling. In making such payment this not only benefited Stanolind to the extent of some 91%, but it also benefited the other participants, Frost-Hidrocarburos-Davis, to the extent that they were relieved from their obligation to continue to pay 9% of the total annual outlay with a dollar limit which might cost Davis some $600,000 over the remaining life of the contract, since Davis admittedly owed whatever was charged to the Frost-Hidrocarburos-Davis interest. Thus Davis profited to the extent of the entire drilling cost that would otherwise be charged against these interests if the contract had been permitted to continue rather than being terminated by the payment of the million dollar penalty amount.

In these circumstances we think it clear that the payment made by Stanolind in termination, whether it be called a penalty or something else, was truly a payment in lieu of further expenditures to be made for continuing the program. We conclude, therefore, that the termination payment was properly part of "the costs of the exploration and drilling program contemplated by the basic agreement."

By the very nature of the contract, neither party has been able to call our attention to any specific authorities that help much in our efforts to construe this contract. Appellees cite for our attention, Forest Oil Corporation v. Federal Power Commission, 5 Cir., 263 F.2d 622, in which this Court stated that "the cost of exploration and development": "represents the cost of finding potential fields as well as the drilling of the dry wells that seem to be a necessary part of any continuing oil or gas business." They also cite Reid v. Gulf Oil Corporation (Tex.Civ.App.1959), 323 S.W.2d 107, which spoke of the phrase "drilling operations," as embracing "all of the physical and mechanical aspects of bringing about the production of oil or gas in paying quantities."

We think these cases do not add materially to our understanding of this contract, nor do Sterling v. McKendrick, Louisiana Court of Appeals, 1961, 134 So.2d 655, Burke v. Bennett Drilling Co., Okl., 371 P.2d 477, or Kingswood Oil Co. v. Bell, 7 Cir., 244 F.2d 115 cited by the appellant.

In view of the very clear benefit that accrued to Davis by reason of the payment of the termination penalty and the absence of any indication that the final agreement was intended to change the relationship as to the cross obligations between him on the one hand, and Frost's interest on the other, we conclude that the trial court erred in construing the contract so as to relieve Davis from the obligation of paying the Hidrocarburos share of the penalty.

We find no merit in appellee's contention that the decision below can be supported on the ground that the complaint failed to state a claim upon which relief could be granted. The trial court granted a motion to strike this defense and the appellee did not appeal from this order. Moreover, the final assignment should be read as providing that any obligation running between Davis and Hidrocarburos also runs between Davis and Frost.

■ Finally, we conclude that the defense of the statute of limitations is not good, nor is the defense of a bar by the Delaware judgment which dismissed a similar complaint there where a shorter period of limitations applied. We agree that the cause of action accrued, not when Frost first demanded payment, but when Davis first refused it; thus, the suit was not barred by either the Florida or the Texas statute.

The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.