Argued July 6, reversed and remanded September 7, 1960

# MILLER CONSTRUCTION CO. *v.*
# WATTS CONSTRUCTION CO.

355 P. 2d 215

*Lewis K. Scott,* Portland, argued the cause for appellant. On the brief were Donald A. W. Piper, Klamath Falls, Koerner, Young, McColloch & Dezendorf and W. F. Lubersky, Portland.

*Herman Smith,* Klamath Falls, argued the cause for respondent. With him on the brief were Maxwell & Goddard, Klamath Falls.

Before Rossman, J., presiding, and Perry, Sloan, Goodwin and Holman, Justices.

ROSSMAN, J.

This is an appeal by the defendants from a judgment in the amount of $7,868.65 which the circuit court entered in favor of the plaintiff after it had sustained that party's motion for a directed verdict. The amount of the judgment constituted the sum due to the plaintiff, according to the belief of the trial judge, for readymix concrete which the plaintiff had delivered to the defendant pursuant to a written contract signed by the parties on July 19, 1955. The

contract was entitled "Purchase Order." The judgment also found for the plaintiff, based upon further directed verdicts, upon two counterclaims, alleged in answer, the respective sums of $15,000 and $1,628.

In seeking reversal of the challenged judgment the defendant contends that the plaintiff breached the contract, which we have mentioned, and thereby damaged the defendant in the amounts of the two counterclaims.

The plaintiff, located in Klamath Falls, is in the business of supplying contractors with readymix concrete. The defendant is a building contractor which had a contract with the U. S. Navy at the times material to this case, for the erection of some buildings at the Klamath Falls Air Force Base. One of the buildings was entitled Airmen's Mess and another was called Fire Station. The construction of the buildings required the use of readymix concrete. The plaintiff, in the written contract which it signed with the defendant, agreed to supply the latter with all the needed concrete at the price of $17 per cubic yard. The contract required the concrete to conform to the specifications governing concrete that constituted a part of the contract between the defendant and the Navy. The contract (between plaintiff and defendant) stated:

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| All required | Readymix Concrete to be furnished to jobsite in accordance with plans and Navdocks specifications No. 44451 for Contract No. NOy84875. Concrete to meet all requirements of Section 5 of the specifications. | |

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| | *Airmen's Mess:* | |
| | Estimated quantity—394 cubic yards—Class D-1 2500 # Air-entrained—at $17.00 per c.y. | $6,698.00 |
| | *Fire Station:* | |
| | Estimated quantity—232 cubic yards—Class D-1 2500 # at $17.00 per c.y. | 3,944.00 |
| | Inspection of cement and concrete is required as noted in Paragraph 5-03 and Paragraph 1-10 of the specifications. Materials and equipment that have not been inspected and approved in accordance with contract requirements may be rejected. | |

Mr. Willard D. Miller, president of the plaintiff corporation freely admitted that the plaintiff possessed a copy of the specifications governing concrete that formed a part of the contract between the Navy and the defendant. For example, he testified, "We did have the specifications."

It will be noticed that the contract between the plaintiff and the defendant required the plaintiff to furnish, among other quantities, the above specified amount of "Class D-1" concrete for the construction of the buildings known as Airmen's Mess and Fire Station. The record indicates that the symbol "Class D-1" was employed in the contract to designate the mix and kind of ingredients for the concrete which the plaintiff bound itself to deliver to the defendant. The same symbol was employed in the defendant's contract with the Navy. The specifications made clear the connotation of the symbol. There is no controversy upon those subjects.

The contract between the plaintiff and the defendant specified in the following manner the time when the plaintiff was required to deliver concrete to the defendant: "Delivery Requirements As called for by Job Superintendent so as not to delay work. Ship via Your trucks."

We have noticed that the contract fixed the price of Class D-1 readmix concrete as $17 per cubic yard. It required the plaintiff to supply an estimated amount of 394 cubic yards of Class D-1 concrete for Airmen's Mess at the price just stated, that is, $17 per cubic yard or a total of $6,698. It also required the plaintiff to deliver an estimated amount of 232 cubic yards of Class D-1 concrete for the Fire Station at the price of $17 per cubic yard or a total of $3,944.

Several other contractors in addition to the defendant were constructing buildings at the Klamath Falls Air Force Base and the plaintiff was supplying some of them with readymix concrete. At the outset the plaintiff used in the preparation of its concrete sand obtained from a local source. August 4, 1955, the plaintiff by a letter told the defendant that it was no longer able to obtain local sand in sufficient quantity and that "Marysville sand is the only other sand acceptable by the Navy for gradation and purity and gravity test." The letter notified the defendant that the plaintiff would thereafter increase to the extent of $2 per cubic yard its charge for concrete. From that time on the plaintiff charged $19 per cubic yard for its readymix concrete—not $17. The testimony of Mr. Miller, aforementioned, makes it clear that the plaintiff found it necessary to use Marysville sand because the Navy would reject any concrete that entered into construction work of the kind which the defendant was performing for the Navy if local sand

was used in the concrete. The plaintiff makes no contention that the defendant was in any way responsible for the need which the plaintiff faced to employ Marysville sand, or that the contract, which the parties signed July 19, 1955, authorized it to increase the price.

In its statement of account which it rendered to the defendant following the letter of August 4 the plaintiff entered the amount of $19 per cubic yard as the price of concrete, and not the sum of $17 which was the amount stipulated in the contract. The defendant urges that this unilateral advancement of the contract price was a breach of the contract. We will shortly return to this phase of the case.

Mr. Miller, to whom we have referred, testified that the specifications required Class D-1 concrete "to reach 2500 pounds per square inch in twenty-eight days." By returning to the excerpt from the contract which is quoted in a preceding paragraph it will be noticed that it mentions the requirement. Mr. Miller explained that

"* * * on the tests for concrete there is a cardboard or steel cylinder four inches in diameter and twelve inches in length in which a sample of concrete is put in this container, then rodded down, then cured for twenty-eight days, then it is stripped either of the cardboard or the steel container, depending on the type, and put in an hydraulic press. It has a gauge on it that indicates strength in pounds per square inch. Normally it is an hydraulic press, and it is literally squeezed until it breaks. * * *"

In that way the test determines whether or not at the end of 28 days the concrete can withstand the required pressure of 2500 pounds and thus meet the

demands of the specifications. We take the following also from Mr. Miller's testimony:

"Q Now, is it a further fact that the concrete, the ready-mixed concrete that was used by the Watts Construction Company on the base, had to be tested in the fashion that you have stated under the requirements of Exhibits 1 and 2?

"A Yes, I would think so.

"Q And each core had to be so tested; isn't that right?

"A Yes, normally they would check it each day and take an average over the job.

"Q And you expected that, or your organization expected that in entering into the contract with Watts Construction Company?

"A Yes.

"Q You knew that the specifications required that?

"A That is right."

Mr. Miller agreed that samples were regularly taken of the concrete which the plaintiff had delivered to the defendant and that they were sent to Northwest Testing Laboratories in Portland to undergo the test which he described in the words quoted from him in the preceding paragraph of this opinion.

The defendant's job superintendent was one Alfred Morris. He was the officer of the defendant who gave to the plaintiff from time to time orders for the delivery of concrete. The orders stated the amount of concrete which the defendant wished to receive and the hour of the following day when the plaintiff should make delivery. Morris testified that by August 31 the construction of the Mess Hall had reached the point where he wished to pour in it a large structural slab. Its pouring was a prelude to the next

phase of the construction of the building. Morris' uncontradicted testimony shows that on August 31 he placed an order with the plaintiff for the delivery to the Mess Hall on the following morning of ready mixed concrete. The concrete, however, was not delivered on September 1. Actually, none was delivered to the defendant after that day until October 13, 1955. That fact is free from dispute. Mr. Miller testified:

"Q So that between approximately the first of September and the 13th of October of 1955 you made no deliveries to the Watts Construction Company?

"A No, I don't believe we did."

■ The defendant contends that the plaintiff's failure to have delivered on September 1 or thereabouts the concrete which it ordered August 31 was a further breach of the contract. The plaintiff makes no claim that the defendant was in any way responsible for the plaintiff's inability to have delivered the concrete which the defendant had ordered. Nor does the plaintiff argue that any part of the contract condoned the plaintiff's failure to deliver the concrete. The defendant offered evidence showing that the plaintiff's failure to have delivered the required concrete in the period of August 31 to October 13 subjected the defendant to damages which formed the bases of its two counterclaims.

It is clear that the defendant received no concrete from the plaintiff between August 31 to October 13. It is also clear that the defendant was in no way to blame for plaintiff's inability to furnish the defendant with concrete. The defendant, in an effort to explain the plaintiff's inability to deliver any concrete in the period just mentioned, offered the explanation which had been given to Mr. Morris by an

officer of the plaintiff whose name is Thomas W. Timmons. The testimony giving Timmons' explanation was excluded by the trial judge on the ground that the defendant had not shown that Timmons had authority to speak for the plaintiff. Timmons, according to Miller, was the plaintiff's public relations officer. Miller explained that Timmons "was a contact man." He added that Timmons' duties were "coordinating our work at the airport, talking to the various contractors * * * making sure that, trying to eliminate as much confusion as he could." He also testified:

"Q * * * as far as dealing with these contractors over ordering concrete and supplying concrete to them, he was authorized to make statements for the corporation; is that true?

"A I think that is true; yes.

"Q And to speak generally about the Company's ability to supply them?

"A I think so, yes."

The construction work at the air base increased greatly the plaintiff's volume of business. At times several contractors requested delivery at the same hour. The plaintiff expected Timmons to adjust problems of that kind. The examination continued as follows:

"Q And he would be able to promise them that they could receive the concrete, isn't that true, if they would order it?

"A Yes, I think so.

"Q Now, if something came up so that these promises couldn't be fulfilled, would he be authorized to explain why for the corporation?

"A In the sense I think that he could explain what the problem was, if there was a problem. * * *"

We add that the defendant had been promised delivery for a specific hour of September 1.

We notice that it was Timmons who signed the plaintiff's signature to the letter of August 4, 1955, which notified the plaintiff's customers who were doing construction work at the air base that the plaintiff was increasing by the sum of $2 per cubic yard its price for concrete.

The foregoing reveals, according to plaintiff's president, the authority which Timmons possessed to explain to the plaintiff's customers the reason for nondelivery of concrete whenever the plaintiff was unable to make promised deliveries.

Morris sought to testify that when the plaintiff failed on September 1 to deliver the concrete which Morris had ordered August 31 Timmons called on him several times with explanations for the nondelivery and expressed hopes that the difficulty would soon be overcome. Upon one visit Timmons told Morris, according to the offer of proof, that delivery would be made in two or three days. Later explanations extended the delay to a longer period. In the explanations Timmons told Morris that the plaintiff was having trouble with the aggregates which it was using in the concrete and that the samples of concrete that had been taken were undergoing tests. In one of the visits he told Morris that the plaintiff would be forced to find a new source of aggregates and submit a sample of them for testing. Miller testified that in the period of August 31 to October 13 the plaintiff, upon the recommendation of the Northwest Testing Laboratories, installed equipment for washing the aggregates. After the aggregates had undergone washing the plaintiff encountered no more difficulties.

The trial judge rejected as inadmissible the offers of proof which gave the above mentioned explanations for the delay. He ruled that the defendant had not proved that the plaintiff had authorized Timmons to speak upon the above mentioned subjects.

We think that it is clear that plaintiff had empowered Timmons to deal with the plaintiff's customers and not only assure them of the hour when concrete would be delivered but also explain the cause of nondelivery whenever it happened that the plaintiff could not make a scheduled delivery. The authority to name an hour for the delivery of the concrete and explain failures of delivery were seemingly the very essence of Timmons' function as public relations officer. It was Timmons to whom Morris often spoke when he requested deliveries of concrete. When Timmons came to Morris after the nondelivery of September 1 and explained to him the cause of plaintiff's inability to have filled the order and offered a prediction when delivery could be expected, the problem that confronted Morris was an important one. The defendant's construction program was being seriously interrupted through the lack of concrete, and the interruption was subjecting the defendant, as the plaintiff must have known, to heavy extra expenses. Miller's testimony concerning Timmons' authority indicates that Timmons was empowered to speak upon the very problem that faced the defendant. We are satisfied that the plaintiff had conferred authority upon Timmons to make explanations of the kind that were mentioned in the offer of proof. The testimony should have been received. The rulings which rejected it were erroneous.

But we do not believe that it was essential to the maintenance of the defense or the establishment of

the counterclaims that the defendant should explain why the plaintiff had not delivered to the defendant concrete on September 1, 1955. It will be recalled that the contract required the plaintiff to deliver concrete "as called for by Job Superintendent so as not to delay work." The plaintiff makes no contention that Morris' request for the delivery of concrete on the morning of September 1 was unreasonable or beyond the scope of the plaintiff's contractual duty. In fact, if Morris told the truth, the plaintiff assured him August 31 that the concrete would be delivered on the morning of September 1. The failure to have delivered the concrete was a breach of the contract whether or not the defendant was able to explain why it was not delivered. As we have said before, the plaintiff does not claim that the defendant was in any way responsible for the non-delivery of the concrete. Likewise, the plaintiff advances no contention that its failure to have delivered was justified by the contract. The plaintiff intimates that the Navy shut down the construction work at the air base but no one on behalf of the Navy testified to that effect. No witness sought to justify the plaintiff's failure to have delivered the concrete which the plaintiff ordered August 31.

■■ The evidence reviewed in the preceding paragraph shows that the plaintiff increased the price of readymix concrete to the extent of $2 per cubic yard. In seeking to justify its action in making the increase the plaintiff calls attention to the fact that the defendant made payment of a statement of account which included the unwarranted extra charge of $2 per cubic yard. It argues, "by accepting and paying for the concrete containing the Marysville sand, defendant assented to the additional charge and cannot

now at this late date deny the modification of the original agreement as to the price of the concrete."

The answer alleged that although the defendant had performed all the conditions of the contract "the plaintiff breached said contract on or about August 13, 1955, by refusing to furnish any more concrete at the agreed price." The averment that we just quoted appears in paragraph IV of the second counterclaim of the answer. The reply, referring to that averment, states: "Plaintiff denies the allegations contained in paragraph IV of defendant's second counterclaim." No modification of the contract was alleged. It will be seen that the reply denied that the plaintiff exacted an extra charge for the concrete. Thus, neither by reply nor by any other pleading did the plaintiff allege a "modification of the original agreement." A modification of an agreement requires consideration to the same extent as was required to form the original agreement. No intimation is made that the defendant received any consideration for the purported modification. It might possibly be argued that payment constituted a waiver of the plaintiff's lack of power to make the extra charge; however, under the circumstances of this case a waiver would have to be alleged. Phillips Code Pleading, § 434; Clark on Code Pleading, page 194; 56 Am Jur, Waiver, § 18, page 118; and *Williams v. Mt. Hood Railroad and Power Company,* 57 Or 251, 110 P 490, 111 P 17. We do not believe that the plaintiff established a modification of the agreement or any waiver.

■ Although in the foregoing we have not mentioned the assignments of error, we nevertheless believe that we have shown our disposition of all of them. The motions for the directed verdict upon the cause stated in the complaint should have been denied. The plain-

tiff breached its contract by making the unauthorized increase of $2 per cubic yard in its charge for the concrete and by failing to deliver concrete pursuant to the order of August 31. We sustain the assignment of error based upon that erroneous ruling. The defendant, in its counterclaims, sought to recover the extra charge of $2 per cubic yard which it was forced to pay in order to secure delivery of concrete. It also sought to recover in the other counterclaim for the extra construction expenses to which it was subjected when it was unable to obtain concrete in the period of August 31 to October 13. We have failed so far to state that the plaintiff discontinued in October the delivery of all concrete when the defendant declined to pay the plaintiff's charges. Verdicts should not have been directed against the defendant upon its two counterclaims. We sustain the assignments of error that are based upon those rulings. The other assignments of error challenged principally the rulings whereby the defendant was denied opportunity to give Timmons' explanations of why the plaintiff did not deliver concrete in the period of August 31 to October 13. Although that evidence was unnecessary, no objection of immateriality and irrelevancy was made.

We sustain the assignments of error. The challenged judgment is reversed. The cause is remanded to the circuit court.