UNION PACIFIC RAILROAD COMPA-
NY, a corporation, and Oregon-Wash-
ington Railroad & Navigation Company,
a corporation, Appellants,

v.

CHICAGO, MILWAUKEE, ST. PAUL
AND PACIFIC RAILROAD COM-
PANY, a corporation, Appellee.

No. 75–1441.

United States Court of Appeals,
Ninth Circuit.

Dec. 29, 1976.

Randall B. Kester (argued), Portland,
Ore., for appellants.

J. Laurence Cable (argued), Portland,
Ore., for appellee.

Before TRASK and GOODWIN, Circuit Judges, and JAMESON,* District Judge.

GOODWIN, Circuit Judge.

The Union Pacific Railroad Company appeals a judgment of the district court, following a decision that a contract between the Union Pacific and the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (the Milwaukee) terminated when the connecting tracks were removed. We affirm.

In 1910, the predecessor to the Union Pacific (the Oregon-Washington Railroad & Navigation Company) entered into three trackage agreements with the predecessor to the Milwaukee (the Chicago, Milwaukee & Puget Sound Railway Company).[1] These contracts provided for the construction and operation of a continuous railroad system running from Morengo, Washington, through a depot in Spokane, Washington, to a point called Northern Pacific Crossing which is located in the eastern part of Spokane. A fourth contract executed in 1913 provided for the joint use and operation of terminal facilities in downtown Spokane.

The tracks were divided into three sections, each to be covered by a separate contract.

The Spokane-Morengo joint contract provided for the construction and maintenance of the western section of the line. Pursuant to this agreement, the Union Pacific constructed some 60 miles of track which ran from Morengo to Monroe Street in Spokane. The Union Pacific also had a continuing duty to maintain these tracks. The Milwaukee obtained an irrevocable right to use this section of track in exchange for making two payments. The payment here in issue is the so-called "rental payment", which was based upon a percentage of the capital expenditures made by the Union Pacific in constructing the tracks. This payment was to continue for 999 years whether or not the Milwaukee actually used the tracks. A second payment, not here in issue, was based upon actual usage of the tracks.

The Center Street-Northern Pacific Crossing joint contract provided for the construction and maintenance of the eastern section of the line. Under this contract, the Milwaukee was to construct a line connecting Center Street in downtown Spokane with the Northern Pacific Crossing. The Union Pacific was given an irrevocable right to use this line in exchange for the rental and usage payments. Except for the change in the positions of the parties and the obvious differences necessitated by geography, the terms of this contract are identical to those contained in the Spokane-Morengo Agreement.

The third contract, called the Union Terminal contract, provided for the construction and use of the center portion of this line. These central-city tracks connected with the Spokane-Morengo Line on the West and with the Center Street-Northern Pacific Crossing Line on the East. This agreement, which was of indefinite duration, provided for the joint ownership and construction of this section of the track and for the terminal facilities.

Three years later, after all the tracks had been constructed, the parties consummated the Union Depot contract which governed use of the terminal facilities. This agreement was also of indefinite duration and was terminable by either party upon a notice of one year.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. Because this is a diversity case, there is a choice-of-law problem. We apply the conflicts-of-laws rules of Oregon, the forum state. *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608 (9th Cir. 1975). The Oregon rule ordinarily looks to the law of the state in which the contract was made. *See Giustina v. United States*, 190 F.Supp. 303 (D.Or.1960), *aff'd*, 313 F.2d 710 (9th Cir. 1962). However, we find nothing in the record or in the briefs of the parties which discloses the state in which the contracts were made. Neither party has made an issue of the place of contract, and nothing turns upon the choice of law. Accordingly, we apply the law of the forum, which substantially accords with the general law on contracts.

In the late 1950's public pressure forced the two railroads to consider abandoning their jointly owned central-city tracks and terminal facilities in order to make the land available for a civic river-beautification project.

The plans for Expo '74 in Spokane intensified the public pressure for the city to acquire this land, and negotiations between Spokane and the railroads were accelerated. As time passed, city condemnation of the tracks appeared imminent. In the end, the railroads abandoned the tracks and related facilities between Monroe Street and the Northern Pacific Crossing, and the land was conveyed[2] to the City of Spokane for adequate consideration. The City then removed the tracks, supporting structures, and other facilities. The City also condemned the eastern 300 feet of the Spokane-Morengo Line because the removal of the other tracks had left an unsightly dead-end bridge 80 feet in the air over Monroe Street.

The Union Pacific continues to use the western part of the Spokane-Morengo Line. At Fish Lake, which is located some 47 miles east of Morengo, the Union Pacific has constructed a spur line which connects with the tracks of the Burlington Northern. The Burlington Northern line provides an alternate route to the Northern Pacific Crossing and the Union Pacific now routes its traffic over this alternate route. The section of the Spokane-Morengo line between Fish Lake and a point some 300 feet west of Monroe Street is not currently in use, but these tracks are still maintained by the Union Pacific. The Union Pacific has an option to lease this land to the City after the issues in the present lawsuit are resolved.

The Milwaukee discontinued its use of any part of the Spokane-Morengo Line as early as 1961. Until 1972, however, it continued to pay the contract rental of $167,-000 a year. Then, in December of 1971, the Milwaukee notified the Union Pacific that it was terminating the Spokane-Morengo Contract because of material changes in circumstances since the consummation of the agreement.

The Union Pacific brought this action to seek a declaration of its rights under the Spokane-Morengo Agreement. At trial, the Union Pacific contended that because all but 300 feet of the Spokane-Morengo Line was still in place and serviceable, the Milwaukee should continue to make full rental payments. The Union Pacific characterizes the rental payment as an interest payment which was to reimburse the Union Pacific for its construction costs. As its investment in the line is fully executed, the Union Pacific argues that the duty of the Milwaukee to make these interest payments is absolute. Alternatively, the Union Pacific argues that any termination of the contract should operate pro tanto. That is, the Milwaukee should at least be required to pay rent upon the tracks running from Morengo to Fish Lake (with connections via the Burlington Northern to Northern Pacific Crossing).

The trial court held that since the parties contemplated the existence of a continuous railroad system when they entered into these agreements the continued existence of that system was an implied condition of the Milwaukee's duty to make rental payments. The court ruled that when the connecting tracks were conveyed to the City of Spokane (and subsequently removed) the parties' rights and obligations under the Spokane-Morengo Contract terminated. The court gave the Union Pacific judgment for only those rental payments which accrued from December of 1971 to June 1, 1972, the date of the conveyance to the City.

Most contracts include implied conditions that are indispensable in effectuating the intentions of the parties. *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 47 S.Ct.

---

**2.** We find upon our independent view of the record that neither party was "at fault" in causing the tracks in question to be conveyed to the City of Spokane. Most of the instances cited by the parties to pin the "fault" on the other are examples of attempts by the parties to present themselves in the best light in this litigation.

368, 71 L.Ed. 663 (1927); *Upper River Columbia Towing Co. v. Glens Falls Insurance Co.*, 179 F.Supp. 705 (D.Or.1959); *Pinnacle Packing Co. v. Herbert*, 157 Or. 96, 70 P.2d 31 (1937); 4 S. Williston, Contracts § 610(b) (3d ed. 1961); 3(a) A. Corbin, Contracts § 632 (1960). Such a condition can be fairly implied from the facts in this case.

■ It is also a basic principle of contract law that two or more agreements executed at the same time by the same parties as a part of the same transaction should be construed together as one contract. *Oregon-Pacific Forest Products Corp. v. Welsh Panel Co.*, 248 F.Supp. 903 (D.Or.1965); *Meier v. Porter*, 256 Or. 261, 472 P.2d 814 (1970); *Hays v. Hug*, 243 Or. 175, 412 P.2d 373 (1966); *Norton v. Van Voorst*, 191 Or. 577, 587, 231 P.2d 947 (1951); 4 S. Williston, Contracts § 628 (3d ed. 1961); 3 A. Corbin, Contracts § 549 (1960).

■ In this case the three trackage agreements were all executed on April 15, 1912, by the predecessors of the Union Pacific and the Milwaukee. They are obviously part of the same transaction. Therefore, for purposes of this litigation, the contracts must be viewed as one agreement. Such a construction leaves little doubt that the parties contemplated the existence of a continuous railroad system when they entered into the Spokane-Morengo Contract.

This view is strengthened when we consider the circumstances which surrounded the execution of the contract. See ORS 42.220; *Card v. Stirnweis*, 232 Or. 123, 374 P.2d 472 (1962); *Klimek v. Perisich*, 231 Or. 71, 371 P.2d 956 (1962); Restatement of Contracts § 238 (1932); 4 S. Williston, Contracts § 629 (3d ed. 1961). The City of Spokane, while not a party to the contracts, was actively interested in the agreements. The ordinances authorizing construction of the central-city tracks were expressly conditioned upon prior construction of the west-

erly and easterly access tracks (Section 18 of Ord. No. A–5232). Also, the ordinances authorizing construction of the eastern and western access routes required that the lines connect with the terminal property. (Ord. Nos. A–5230, 5231). These ordinances were all passed on the same day.

We note, too, that all three sections of this line were opened on the same day and that no rental payments were charged for any of the access routes until all were completed.

The express language in the contracts states that the eastern and western lines are to connect with the terminal property. The contracts refer to the authorizing ordinances, lending further support to the conclusion that these parties contemplated the existence of a railroad system when they entered into these contracts. That these expressions appear in the recitals does not negate their import upon our inquiry into the intentions of these contracting railroad companies. *Henry G. Meigs, Inc. v. Empire Petroleum Co.*, 273 F.2d 424, 428 (7th Cir. 1960); *Kingwood Oil Co. v. Bell*, 136 F.Supp. 229 (E.D.Ill.1955), *aff'd*, 244 F.2d 115 (7th Cir. 1957); *Bowen v. Sil-Flo Corp.*, 9 Ariz.App. 268, 451 P.2d 626 (1969); *Frenchman and Sweet, Inc. v. Philco Discount Corp.*, 21 A.D.2d 180, 249 N.Y.S.2d 611 (1964). No express contract provision conflicts with this manifestation of intention. The Milwaukee assumed the risk under the Spokane-Morengo Contract that it might discontinue its use of the track yet still be bound to the rental payments. It did not, however, assume the risk that most of the Morengo-Northern Pacific Crossing line would be destroyed.[3]

All these factors taken together lead to the conclusion that the parties contemplated the existence of a continuous railway system when they entered into these contracts. The continued existence of that system is thus an implied condition of each of

---

**3.** We are aware that the Milwaukee would have no use for this rail line if it were still in existence. However, until the somewhat fortuitous proceedings which led to the removal of these tracks, the Milwaukee had lived up to its

contractual obligations. It is of no legal significance that the Milwaukee had not used the tracks for some ten years prior to this litigation.

the agreements, including the Spokane-Morengo Contract.

█ The district court held that when the tracks running from some 300 feet west of Monroe Street to Northern Pacific Crossing were conveyed to the city, leaving the Spokane-Morengo Line at a dead end, this condition failed. The Union Pacific argues that the implied condition was applied too broadly because there is presently a continuous railroad route from Morengo to Northern Pacific Crossing, albeit via the tracks of the Burlington Northern. When the Union Pacific negotiated its own trackage agreement with the Burlington Northern, it made arrangements for the Milwaukee to use the tracks on the same terms. The Milwaukee did not wish to become part of this agreement and did not sign it.

█ Nevertheless, the Union Pacific argues that the Milwaukee should be obligated for the rental payments covering that portion of the Spokane-Morengo line running from Morengo to Fish Lake, where the line connects with the Burlington Northern tracks. We find that the district court correctly dealt with this argument. One party cannot unilaterally modify a contract without the consent of the other party (*Hanson v. Puget Sound Navigation Co.*, 52 Wash.2d 124, 323 P.2d 655 (1958); *Marnon v. Vaughan Motor Co.*, 184 Or. 103, 194 P.2d 992 (1948)), or without consideration (*Carothers v. Carothers*, 260 Or. 99, 488 P.2d 1185 (1971); *Miller Construction Co. v. Watts Construction Co.*, 223 Or. 504, 355 P.2d 215 (1960)).

The Restatement of Contracts § 463 (1932), relied upon by the appellants, does not require a contrary result. It conditions the right to substitute performance upon the existence of a substitute performance that is an unsubstantial variation. We cannot say that the change in route produced an insubstantial variation in the parties' original agreement.

4. In light of this disposition, we find it unnecessary to rule upon the other theories relied upon by the district court, such as the decision that the continued maintenance of the eastern 13

We agree with the conclusion of the district court that the Spokane-Morengo Contract was terminated in its entirety when the connecting lines were conveyed to the city.[4] We therefore affirm the judgment of the district court in all respects.

miles of the line was an unreasonable burden on interstate commerce. Neither do we reach the other arguments presented by the appellees.